## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## LESLIE METAL ARTS COMPANY, INC., Respondent.

### No. 74–1505.

United States Court of Appeals, Sixth Circuit.

Jan. 22, 1975.

---

Elliot Moore, Deputy Associate Gen. Counsel, Peter Nash, John S. Irving, Jr., Patrick H. Hardin, Jay E. Shanklin, Morton Namrow, N.L.R.B., Washington, D. C., Bernard Gottfried, Director Region 7, N.L.R.B., Detroit, Mich., for petitioner.

J. Michael Guenther, Miller, Johnson, Snell & Cumminskey, Charles C. Hawk, Grand Rapids, Mich., for respondent.

Before EDWARDS and MILLER, Circuit Judges, and McALLISTER, Senior Circuit Judge.

PER CURIAM.

This is an application pursuant to Section 10(e) of the National Labor Relations Act as amended, 29 U.S.C. § 151 et seq., for enforcement of an order of the National Labor Relations Board requiring Leslie Metal Arts Company, Inc. to cease and desist from preventing employees from exercising their rights under Section 7 of the Act. The Board's order also required back pay awards and reinstatement of certain employees who had been suspended or discharged as the result of a disputed labor incident. The order was based upon a finding that Leslie had violated Section 8(a)(1) of the Act by suspending employees Lenard, Knoll, and Wildfong, discriminating against Knoll when he became an unfair labor practice striker, and by threatening employees with disciplinary action when they engaged in a strike or walkout protected by the Act. The findings of fact made by the Administrative Law Judge and approved by the Board we find supported by substantial evidence. We incorporate them in the appendix hereto.

Upon these findings of fact, the Board concluded: (1) that McDonald, Lenard, Knoll, and Wildfong were engaged in activity protected by Section 7 of the Act when they walked out and that the following suspensions and discharges violated Section 8(a)(1) of the Act; (2) that, by refusing to return to work on March 13, Knoll became an unfair labor striker and that Brown's statement to Knoll that he would be considered as having voluntarily quit if he did not return to work on Thursday was a threat to take

disciplinary action if he did not refrain from this protected activity; and (3) that when Debski told McDonald that the employees who had walked out would have to return to work immediately or face strict disciplinary action on the following Monday, he committed an unfair labor practice.

The crucial question before us is whether the Board was correct in finding that the employees' complaints concerning the company's failure to correct the conditions resulting from Gallegos' conduct, predominated over any personal complaint they had against Gallegos herself.

■ Section 7 of the Act grants employees the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." An employer commits an unfair labor practice under Section 8(a)(1) when it interferes with, restrains or coerces employees in the exercise of their Section 7 rights. However, all concerted activity is not protected under Section 7. Protected activity must in some fashion involve employees' relations with their employer and thus constitute a manifestation of a "labor dispute." Section 2(9) of the Act defines a "labor dispute" as " . . . any controversy concerning terms, tenure, or conditions of employment . . . ." See e. g., N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).

■ When employee activity is directed at circumstances other than conditions of employment, it is outside the protection of Section 7. For example, in Joanna Cotton Mills Co. v. N.L.R.B., 176 F.2d 749 (4th Cir. 1949), it was held that the circulation of a petition by an employee for the removal of a foreman against whom the employee held a personal grudge was not protected activity. Similarly, in AHI Machine Tool and Die, Inc. v. N.L.R.B., 432 F.2d 190 (6th Cir. 1970), it was held that a walkout in protest of the discharge of a fellow employee who had "violently and unlawfully slugged a supervisor" was unprotect-

ed. Cleaver-Brooks Manufacturing Corp. v. N.L.R.B., 264 F.2d 637 (7th Cir.), cert. denied 361 U.S. 817, 80 S.Ct. 58, 4 L.Ed.2d 63 (1959), also found unprotected a strike protesting the replacement of a supervisor where the evidence showed the strike to be based on mere personal antipathy toward the new foreman.

On the other hand, not all complaints over the quality of supervison have been held to be unprotected. In N.L.R.B. v. Guernsey-Muskingum Electric Co-op., Inc., 285 F.2d 8 (6th Cir. 1960), it was recognized that protests over the incompetence of a foreman could be the proper subject of protected concerted activity. In reaching this conclusion, the Sixth Circuit relied on the Seventh Circuit case of N.L.R.B. v. Phoenix Mutual Life Insurance Co., 167 F.2d 983 (7th Cir.), cert. denied 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948), in which it was held to be protected activity for employees to make known their views concerning the capability of a proposed new cashier.

In G & W Electric Specialty Co. v. N.L.R.B., 360 F.2d 873, 877 (7th Cir. 1966), the Seventh Circuit summarized the scope of Section 7 as follows:

The range of possible employee mutual interests apart from those which bear a reasonably significant impact upon working conditions or some material incident of the employment relationship is in our opinion a much broader field than Section 7 is designed to encompass.

The Ninth Circuit in Shelly & Anderson Furniture Co., Inc. v. N.L.R.B., 497 F.2d 1200 (9th Cir. 1974), recognized four essential elements of concerted activity protected under Section 7, citing 18B Business Organizations, Kheel, Labor Law § 10.02 [3], at 10–21 (1973):

(1) there must be a work-related complaint or grievance; (2) the concerted activity must further some group interest; (3) a specific remedy must be sought through such activity; and (4) the activity should not be unlawful or otherwise improper. Id. at 1202–1203.

Upon consideration of the history and terms of the statute as well as case authority on the subject, we conclude that the mere personal animosity found to exist between Gallegos and the other employees at Leslie prior to the March 9 chair-pulling incident would have been an insufficient basis for protected concerted employee activity. Yet the case law clearly supports the view that the personal safety of employees is a working condition that can be a valid basis of a labor dispute. The factual findings regarding the Gallegos chair-pulling incident clearly demonstrate the existence of physical and verbal threats to employee safety resulting from the company's failure to maintain plant discipline, largely because of the conduct of a single employee. It is true that an atmosphere of personal animosity had developed between Gallegos and certain other employees. Nevertheless, employees were entitled to be protected against threats of physical violence and other acts of harassment of a fellow employee creating a difficult condition of employment. Under such circumstances they could legitimately protest by concerted activity the failure of the employer to take appropriate action to correct or alleviate the situation.

■ Our enforcement of the Board's order on the facts of this case does not enlarge the scope of Section 7 protection by sanctioning walkouts arising from purely personal quarrels unrelated to labor disputes with an employer. Neither does our decision infer that employers should become involved in personal quarrels between employees. We hold only that when an employer's failure to maintain discipline rises to the point of threatening employee safety, concerted activity by employees in protest against the employer's failure is protected activity under the Act. An employer commits an unfair labor practice under Section 8(a)(1) when he interferes with employees' exercise of such right.

1. Unless otherwise indicated, the findings which follow are based on a composite of the testimony of McDonald, Lenard, Adrian Knoll, and Don Brown. There is little conflict in their testimony as to the essential facts.

The Board's petition for enforcement of its order is hereby granted.

## APPENDIX

### 1. Background and events before March 9

At the time of the events involved herein Betty McDonald, Alice Lenard, Kathy Gallegos and Jane Johnson all worked in the plating department in Respondent's Grand Rapids plant No. 2 on the second shift under the supervision of Paul Vorrheis.[1] [sic] McDonald had worked in that department as a chrome racker since 1966. From mid-September, 1972 until January 29, 1973, she was on sick leave. At the time she went on sick leave, none of the other three worked as chrome rackers.

During McDonald's absence, Gallegos and Lenard both started to work as chrome rackers and were working in that capacity when. McDonald returned to work. In mid-February, Lenard transferred to another department. However, about 2 weeks later an opening was posted for a chrome racker, Lenard requested it, and on March 2[2] Lenard was transferred back to chrome racking. On Monday, March 5 Johnson also was transferred to chrome racking.

There is considerable evidence that relations between Gallegos and Johnson on the one hand and McDonald and Lenard on the other were strained and deteriorating before and after this date. Gallegos had dubbed Lenard "bitch," and Gallegos made statements to Johnson and others, which came to McDonald's attention, that she was going to call the wives of second shift platers Adrian Knoll and Mike Wildfong and tell them they were playing around with other women. Knoll was married to McDonald's daughter, and Wildfong was married to McDonald's niece.

A further conflict and complaint arose from the performance of the racking work. The rackers were paid on a piece-

2. All dates which follow occurred in 1973 unless otherwise indicated.

work basis, but with a maximum on the amount they could earn on one shift. Some parts were considered more desirable to rack because of the prices they bore. McDonald and Lenard believed that Gallegos and Johnson had at times maneuvered to gain the more desirable parts for themselves to rack leaving the less desirable parts for them. There is evidence, less definite in nature, that complaints also had been made against McDonald by Gallegos and others.

On Tuesday, March 6, Voorheis asked Lenard to work as an unracker, a different job in the same department. Lenard protested the assignment on the ground that she had been on the racking job longer than Johnson. Voorheis rejected her protest, but Lenard was not required to work as an unracker that night.

On Wednesday night, Lenard and McDonald separately spoke to plant superintendent Don Brown about Lenard's transfer to unracking, contending that Johnson should be transferred because she had less seniority in the department. Brown, however, took the position that under Respondent's seniority policy, Lenard was the appropriate person to be transferred as she had less seniority in the plant. Lenard told Brown that if she was required to unrack, she would go home. Later that night, when Voorheis instructed her to unrack, Lenard left the plant. The next night she returned to work and was disciplined. She was given a written warning with the explanation that because it was busy a one-day suspension provided under Respondent's rules had been waived.

That night, Thursday, Lenard worked as an unracker, and the other three worked as rackers. During a break McDonald stopped work, but Johnson continued to work and finished a rack which McDonald had started. Johnson

got credit for the performance of that work. Although McDonald was not thereby prevented from earning the maximum rate for the shift, she viewed Johnson's action as an attempt to pick on her and complained to Voorheis. He agreed that Johnson should not have finished McDonald's rack, but attributed Johnson's conduct to aggressiveness and said that he wanted to see Johnson earn the maximum like anyone else. That night, McDonald also complained to Brown about the incident and her belief that Gallegos and Johnson were teaming up against her in order to pick the parts they wanted to rack and to leave the less desirable parts for her. In response to a question by Brown, McDonald said she thought she was being picked on. McDonald also mentioned Gallegos' threats to call Knoll's wife. Brown commented that the latter was a personal matter and said that he would talk to Voorheis about her other complaints.[3]

### 2. The March 9 chair incident and walkout

On Friday, March 9, at the 6:30 p. m. break period, McDonald and Gallegos stopped racking while Johnson continued to work. McDonald and Gallegos sat in the only two chairs available near their work location. Lenard, who was working as an unracker that night, came by to talk with McDonald. While they were talking, Gallegos got out of her chair and went to talk with Johnson where she was working. Lenard sat in the chair that Gallegos had vacated. Gallegos immediately returned and told Lenard to get out of her chair. Lenard refused. Gallegos again told Lenard to get out of the chair. Lenard said that it wasn't Gallegos' chair and that she wasn't moving. Gallegos then grabbed the chair and yanked it out from under Lenard. Lenard kept her balance and

3. McDonald so testified. According to Brown, he told her that he did not like the petty bickering in the department and that he was going to call a departmental meeting to resolve it. Although I believe Brown that he told McDonald that he did not like the petty bickering in the department, I credit McDonald that Brown did not mention [sic] calling a departmental meeting until 2 days later on Saturday. There is no evidence that such a meeting was otherwise mentioned by anyone until Saturday, or that any plans to hold such a meeting had been made.

did not fall. Gallegos then said to Lenard, "For two cents, I'd knock you right on your ass." Voorheis was present and observed the incident. After a pause, Voorheis said that they shouldn't argue over a chair and asked why they didn't go upstairs and get another chair. When no one else moved to get one, Voorheis went and got another chair.

At the end of the break period Knoll and Wildfong walked by. Lenard told them what had just happened, and McDonald told them what Gallegos had said about calling their wives. Knoll said he had heard something about those statements and that he was fed up with Gallegos. McDonald said that she had about had it and wasn't going to take much more of it. However all four returned to work.

A few minutes later Voorheis walked by where McDonald was working. McDonald told him she thought it was pretty "chicken shit" of him to have failed to stop Gallegos or do anything when Gallegos threatened Lenard. Before Voorheis could answer, Gallegos called out, "You old hag. If you've got something to say, say it to me and not to Paul." McDonald answered that she wasn't talking to her. Voorheis said nothing and walked away.

McDonald then decided to leave, figuring that if she stayed it would end in a fight. McDonald got her coat, went toward the timeclock to leave and again encountered Voorheis. She told Voorheis that she was not going to work under "these conditions of being called names and having these girls work against me all the time, and threatening other employees." She told Voorheis she had talked previously to him and Brown about some of these problems and that nothing seemed to be done about it. She told Voorheis that she wasn't going to stay there that night, and he told her that if she wanted leave she should go. McDonald then told Voorheis that she

wouldn't be going alone and that Lenard, Knoll, and Wildfong would also go because they had also had their fill of Gallegos and the working conditions there.

McDonald then went to the timeclock. She was joined by Knoll, Wildfong, Lenard, and another employee Rick Wilbert, as well as Voorheis. A loud discussion ensued. Voorheis asked them what they were trying to do and said they couldn't walk off the job like that. Lenard said she was tired of what she had been taking from Gallegos. Knoll said that something had to be done about Gallegos' conduct.[4] McDonald, Lenard, Knoll, and Wildfong then left the plant.[5]

3. The aftermath of the walkout

After McDonald reached her home, she telephoned Plant Manager Debski and told him that the four employees had walked out because of Gallegos' behavior and the working conditions. Debski said they couldn't leave their jobs like that. McDonald said that she had talked to management 2 days earlier but that nothing had changed. Debski told her that they had to return to work that night or strict disciplinary action would be taken on the following Monday. McDonald said that under the circumstances they would not work any more that night.

Later that night Debski telephoned McDonald and asked her to come to the plant with Lenard on the next morning, Saturday, to talk the matter over with him and Brown.

At the meeting the next morning, Brown asked McDonald why the four employees had left their jobs. McDonald told Brown and Debski about the chair incident the night before, Gallegos' threat to Lenard, Gallegos' calling her names, and Gallegos' threats to call the wives of Knoll and Wildfong. Brown then said that he knew conditions were not the best in the department and that

4. Knoll testified that apart from the chair incident, he was dissatisfied because of Gallegos' threats to call his wife and Wildfong's, because it was too hot where he worked, and because the platers often worked shorthand-

ed. However, he mentioned none of the other reasons to Voorheis at the time he left.

5. Although Wilbert initially indicated that he would also join them, he did not.

there were hostile feelings. He asked McDonald if she had any suggestions as to what could be done to change the attitude of the girls in the department. McDonald made no suggestions. Brown made suggested [sic] one change in work procedure and asked her opinion of it. McDonald at first said she thought it might work, but then disagreed.

After talking to McDonald, Brown and Debski asked Lenard why she had walked off the job. Lenard gave essentially the same reasons as McDonald, mentioning also that Gallegos called her names while at work.[6]

Brown and Debski said that it was ridiculous to have a walkout over these things and that they would have a departmental meeting to try to solve the problem. They told McDonald and Lenard that they were suspended pending further investigation and that they should call the plant on Monday for further information about their status.

On that day Brown and Debski met separately with Gallegos and Johnson, and Gallegos was given a 3-day suspension because of the chair incident.

On March 14 or 15 Brown told McDonald that she had been discharged for instigating a departmental walkout and leaving her job without permission.[7]

On March 13, Brown informed Lenard that she was suspended for 3 days for her second offense in leaving the plant without permission. At the end of the 3-day period Lenard returned to work.

Wildfong and Knoll were each given one-day suspensions. Wildfong returned to work on Tuesday, March 13, but Knoll did not. Knoll talked to Brown and Debski that afternoon before the start of the second shift and learned of the discipline against him. He asked what was being done with respect to McDonald and Lenard, but Brown and Debski only told him that they were still under suspension. Knoll said that he did not want to return to work under those conditions and that he could not return to work and maintain a happily married life.[8]

On Thursday, March 15, Brown called him, asked him if he would come back to work that night, and told him that if he didn't return that night, he would be considered as having voluntarily quit because of unexcused absences. Knoll told Brown that he thought he would be there, but when he learned later that afternoon that McDonald had been discharged, he did not report for work.

The next day, Knoll went to the plant to pick up his check and spoke with Brown. Brown said that he was sorry to see Knoll go, and Knoll replied that he was sorry to go but that he could not return to work in view of McDonald's termination because of his personal family life. Knoll told Brown that he had applied for a prospective job in tool and die work which looked promising. Brown offered to give him a good reference. Knoll thanked him and left.[9]

---

6. McDonald and Lenard so testified as to what they said were the reasons for the walkout. Brown testified that they only mentioned the chair incident as a reason, but that other problems in the department were also discussed in the meeting. I have credited McDonald and Lenard that they voiced all their complaints when asked why they walked out.

7. Brown's testimony indicates that McDonald was disciplined more severely than the other employees because she was deemed the instigator of the walkout and because of her past record.

8. These findings are based on a composite of the testimony of Knoll and Brown.

9. These findings are based on a composite of the testimony of Knoll and Brown. Although Knoll testified that he could not recall whether he made reference to the feeling within his family, he did not deny the [sic] it was mentioned, and Brown so testified.