**VIC TANNY INTERNATIONAL, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–1709.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 8, 1980.

Decided May 16, 1980.

William L. Hooth, Cox & Youngblood, James B. Perry, Troy, Mich., for respondent.

Elliott Moore, Patrick Szymanski, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., Bernard Gottfried, Director, Region 7, N.L.R.B., Detroit, Mich., for petitioner.

Before EDWARDS, Chief Judge, and BROWN and JONES, Circuit Judges.

EDWARDS, Chief Judge.

Petitioner Vic Tanny International, Inc., seeks this court's review and the vacation of a National Labor Relations Board order, reported at 232 N.L.R.B. No. 57 (1977). The Board filed a cross-petition for enforcement of its order. The facts upon which this decision turns are not in any substantial dispute, but the inferences to be drawn therefrom and the application of law thereto certainly are.

Vic Tanny operates one of its 10 health spas in the Detroit area in the City of Livonia, Michigan. In May 1976, four female instructors at the Livonia spa became involved in a dispute with John Baker, manager of the Livonia club. The dispute ultimately led to three of the four instructors being discharged. It is undisputed that the four employees refused to perform certain assigned work and left the premises together to carry their grievances over this issue to the area manager who was located at the Vic Tanny area office in Dearborn.

After a hearing before an Administrative Law Judge, the ALJ found that the three discharged employees were fired for "insubordination" and that their preceding walkout played no role in motivating the discharges. The NLRB unanimously concluded that the ALJ erred in his conclusion concerning motivation of the discharges and held that the discharges were motivated "at least in part by employees' participation in the May 24 walkout." The Board's decision presents the essential facts for our consideration as follows:

"Respondent operates 10 physical fitness clubs in the Detroit metropolitan area. The events herein occurred at its facility in Livonia, Michigan. On May 24, 1976, instructor-employees Rochelle Reagan, Debbie Mitchell, Linda Szabo, and Janet Lange walked off their jobs allegedly in protest against Respondent's decision to require them to pick up payroll checks and supplies at its headquarters in Dearborn, Michigan, 14 miles away. Thereafter, Reagan, Szabo, and Lange were discharged.

\* \* \* \* \* \*

"As noted above, Respondent's Dearborn, Michigan, facility served as headquarters for all 10 clubs in the Detroit metropolitan area. On Monday of each week, each facility would designate one employee to travel to headquarters in order to pick up supplies and paychecks. Prior to May 24, 1976, selection of an employee for the Dearborn trip at the Livonia facility was made on a strictly voluntary basis. The trip was not a sought-after assignment and the employees displayed a general reluctance to volunteer for the trip even though it meant receiving an additional half hour's pay. Indeed, Reagan, Szabo, and Lange were so dissatisfied with the arrangement that employee Debbie Mitchell ended up making the trip on a fairly regular basis.

"In the opinion of Livonia Club Manager John Baker, the primary reason for the employees' dissatisfaction lay in the voluntary nature of the Dearborn assignment. Accordingly, in order to remedy this situation, Baker decided to assign employees to the Dearborn trip on a rotating basis, with each employee traveling once every 4 weeks. Allowances would be made for special unforeseen circumstances.

"On May 21, 1976, Baker conducted a meeting and explained the rotating schedule to the employees. They vociferously protested the decision, but to no avail. It also appears that the issue of these instructor-employees assisting in cleanup duty when the maids were absent was debated.

"On Monday, May 24, the roster for the Dearborn trip was posted and Assistant Manger Mary Kopka informed Reagan that she was responsible for making the trip that day. Reagan refused to go, whereupon Kopka requested that she discuss the matter with Baker. During the ensuing conversation with Baker, Reagan remained adamant in her refusal to go to Dearborn. In response thereto, Baker suspended Reagan for the remainder of the day.

"Following this discussion, Reagan went to the club's coffee room and there disclosed the outcome of her discussion with Baker to her fellow instructors. It was agreed that the four employees would walk off their jobs and go to Dearborn in an effort to resolve the conflict with Baker's superior, Area Supervisor William McDowell.

"At Dearborn, the four employees met with McDowell and aired their grievance. McDowell advised them that they were wrong to walk out and that their action rendered them subject to discharge. He recommended that they return to Livonia and attempt to straighten out the matter with Baker. McDowell also told Baker, by telephone, that they were all subject to termination and action was up to Baker's discretion.

"Upon their return to the Livonia club, Reagan asked Baker to speak to the girls as a group. Baker responded that he would speak with them but on an individual basis. During Baker's conversation with Reagan, Reagan produced and read from a list of grievances which included both the trips to Dearborn and the supplemental maid duties. When Reagan continued to refuse to perform either of these two functions, Baker informed her that she was discharged. Szabo likewise refused to perform either function and as a result was terminated. Lange agreed to travel to Dearborn but refused to engage in cleaning work. Baker informed her that he would consider her position and then advise her of his decision. Later that evening, Baker contacted Lange and notified her that he could not retain her under the conditions she proposed and that she was therefore terminated. Mitchell agreed to perform both functions and was retained. The termination reports for Lange and Szabo indicate that their discharges were the result of insubordination and because they, respectively, 'walked out' and 'walked out on job.'" (Footnotes omitted).

After reciting these facts, the Board reasoned as follows:

"In view of the above, the issues before us are: (1) was the May 24 walkout pro-

tected concerted activity; and (2) if so, was Respondent's conduct in discharging the employees motivated by the walkout. If both questions are answered in the affirmative, then a violation must be found.

"The General Counsel contends that the Administrative Law Judge should have concluded that the walkout was protected concerted activity. We agree. Under the circumstance of this case, the spontaneous banding together of employees in the form of a work stoppage as a manifestation of their disagreement with their employer's conduct is clearly protected activity. *N. L. R. B. v. Washington Aluminum Company, Inc.*, 370 U .S. 9 [82 S.Ct. 1099, 8 L.Ed.2d 298] (1962); *General Nutrition Center, Inc.*, 221 NLRB 850 (1975).

"We also find evidence to support the General Counsel's contention that the discharges were motivated, at least in part, by the employees' participation in the May 24 walkout. First, Respondent's officials commented that the employees laid themselves open to discharge for walking off the job. Second, the information set forth in the termination reports for both Lange and Szabo reveals that their discharges were the result of both insubordination and *having walked off the job*. We find such notations sufficient to establish that the employees' walkout—a protected concerted activity—precipitated the discharges. Therefore, we find that Respondent violated Section 8(a)(1) of the Act by discharging Reagan, Lange, and Szabo in part for exercising their rights guaranteed under Section 7 of the Act." (Footnotes omitted).

The Board thereupon concluded that the Reagan, Lange and Szabo discharges, and the threat of discharge made to those employees and employee Debbie Mitchell, were unfair labor practices, in violation of Section 8(a)(1) of the Act, and ordered that these employees be offered full reinstate-

ment and made whole for any loss of pay they had suffered as a result of the 8(a)(1) violation.[1]

Petitioner Vic Tanny contends that the walkout of the four instructors did not constitute protected concerted activity within the meaning of Section 7 of the National Labor Relations Act, 29 U.S.C. §§ 151–168 (1976), and that there is no substantial evidence to support the Board's finding that the instructors were discharged for engaging in a protected walkout. The emphasis of petitioner is upon the undisputed facts shown in this record that on May 24, 1976, the three discharged employees, plus employee Debbie Mitchell, did indeed refuse to carry out specific orders given them by Manager Baker. It is petitioner's earnest contention that such refusal was insubordination, which was the sole cause of their discharges.

Section 7 of the National Labor Relations Act reads as follows:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title. 29 U.S.C. § 157 (1976).

 It appears clear to this court that the four employees who were discharged on May 24, 1976, had undertaken in concert to discuss several grievances regarding their working conditions with their employer. These grievances pertained to the weekly trip to Dearborn to which each objected and to the requirement that they substitute for

---

1. (a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . .
29 U.S.C. § 158 (1976).

the maid in cleaning up the premises when the maid was absent. It also appears clear to us that when Reagan was suspended for her individual refusal to follow Baker's instruction that she make the trip to Dearborn, all four of the affected employees in concert agreed to leave their work in order to carry their grievances to higher company authority in Dearborn. We do not see how the Board could fail to regard this as protected concerted activity or "other mutual aid or protection" within the meaning of Section 7.

These conclusions, of course, do not terminate our consideration of this case, because in fact, none of the four employees who walked out were subjected to immediate discharge or discipline. Club Manager Baker talked to them individually that same day, reiterated his insistence upon the performance of the trips to Dearborn and the substitute maid duties, and discharged Reagan, Szabo and Lange when each refused to perform the work concerned. Employee Mitchell, at Baker's insistence and on penalty of discharge, agreed to perform the work involved in both the trips to Dearborn and the substitute maid duties and was retained.

As we see the matter, Congress in drafting Section 7 clearly intended to protect not only concerted activity under the sanction of a labor union, but also concerted activity of the same nature engaged in by unorganized employees. Section 7 of the NLRA guarantees employees the right to organize in unions and engage in collective bargaining. It also guarantees unorganized employees the right to engage "in other concerted activities for the purpose of . . . mutual aid or protection." Thus, unorganized employees who jointly participate in a walkout—as in the instant case—to present job related grievances to management are engaged in concerted activity protected by Section 7 regardless of whether or not the employees are members of a union. An employer violates Section 8(a)(1) by discharging or threatening with discharge employees for such a walkout. *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 82

S.Ct. 1099, 8 L.Ed. 298 (1962); *NLRB v. Leslie Metal Arts Co., Inc.*, 509 F.2d 811 (6th Cir. 1975). We see no distinction in the Act or in the remedies available under the Act between employees organized in a union and unorganized employees who, nonetheless, joined in concerted actions to deal with their grievances.

The employer in such a case is not, however, left helpless by the Act. The employer here would have been entitled to refuse to pay the employees who left work or refused to perform assigned duties, just as he could refuse to pay economic strikers in the instance of a strike led by a labor union. He could likewise have replaced the employees with other workers. In other words, the employer in this case, faced with a concerted walkout by unorganized employees over a condition of employment, had the same options available to him that would have been available to an employer faced with an economic strike by unionized employees. What the law prohibited Vic Tanny from doing was to *discharge*—or to threaten to discharge—these employees in whole or in part because they engaged in concerted activity. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *Capitol Broadcasting Co. v. NLRB*, 479 F.2d 329 (6th Cir. 1973).

This conclusion leads us to the next issue in this case, namely, whether there is substantial evidence to support the Board's finding that the three employees were discharged at least in part because of the May 24 walkout.

Regardless of what the employer wrote on their discharge slips, we believe that there would be substantial evidence on the whole record to support the Board's conclusion that the discharges were motivated "at least in part" by the employees' protected concerted activity. "It is not necessary that a prohibited reason [for discharge] be the sole one. If the discharge is motivated in part by activities protected by the National Labor Relations Act, it is a violation of Section 8(a)(1)." *NLRB v. Elias Bros. Restaurants*, 496 F.2d 1165, 1167 (6th Cir. 1974).

The additional fact that two of the three employees' discharge slips recited "walkout" and "walkout on the job" as reasons for their dismissal, while Reagan, the obvious leader of the concerted activity, was given a discharge slip saying "bad attitude" seems to us to represent even greater support for the Board's conclusion that these employees were unlawfully penalized for exercising rights guaranteed by Section 7 of the NLRA.

The Board's order will be enforced.

BAILEY BROWN, Circuit Judge, dissenting.

I respectfully dissent.

My dissent is based on the following facts that were found by the Administrative Law Judge and, more importantly, are *without dispute.* After these four employees had walked out and after they had returned from Dearborn and their conference with the supervisor, they were separately interviewed by the manager, Baker, and each of them was advised that if she would make her share of the trips to pick up payroll checks and do cleanup work when the maid was ill, she would be retained as an employee. Reagan and Szabo refused to perform either task and were thereupon discharged. Lange agreed to make the trips but refused to help with the cleanup; Baker advised her that he would think it over but later that day discharged her. Mitchell agreed to do both tasks and was retained as an employee.

Since the foregoing facts are *without dispute,* I cannot see how it can be said that the decision of the Board (overruling the Administrative Law Judge) to the effect that the concerted activity (the walkout) "at least played a part" in the decision to discharge these three employees is supported by substantial evidence. On the contrary, it is absolutely clear that these three employees were discharged for their refusal to do the work, that is, for insubordination. Accordingly, in view of these undisputed facts, in my opinion the decision of the Board is not supported by substantial evidence.