**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LLOYD A. FRY ROOFING COMPANY, INC. OF DELAWARE, Respondent.**

**No. 78–1537.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 20, 1980.

Decided June 10, 1981.

---

**2.** The Union's charge was made within six months of the time the violations took place, as required by Section 10(b) of the Act.

Elliott Moore, Jay E. Shanklin, Deputy Associate General Counsel, Barbara J. Kraft, N.L.R.B., Washington, D. C., Bernard Levine, Director, Region 8, N. L. R. B., Cleveland, Ohio, Michael R. White, Washington, D. C., for petitioner.

John D. O'Brien, Jones, Day, Reavis & Pogue, Frank C. Heath, James A. Rydzel, Cleveland, Ohio, for respondent.

Before MARTIN and JONES, Circuit Judges, and REED, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

The National Labor Relations Board (the Board) petitions for enforcement of its order that the Lloyd A. Fry Roofing Company (Fry) violated section 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 *et seq.* by constructively discharging an employee because he filed complaints respecting the safety of Fry's equipment. For the reasons set forth below, we grant enforcement.

## I.

Fry is a multistate manufacturer and distributor of asphalt roofing products. At its Medina, Ohio plant, Fry employs approximately 25 production workers, and four over-the-road (OTR) truck drivers who are not represented by a union. On May 21, 1975, Carl Bauer, Fry's office manager at Medina, hired James L. Varney as an OTR driver. Because Varney was a close personal friend, Bauer waived Fry's established policy requiring two years experience as an OTR driver. In December of 1975, Varney was laid off for lack of work. Although Varney had been reprimanded for improperly securing loads and had one accident, Fry recalled Varney in January 1976.

In November 1975, Fry entered into a one-year truck leasing agreement with Joban Leasing Company. Immediately thereafter, each of the OTR drivers complained to numerous Fry officials about the safety of Joban's trucks. Varney also questioned James Beliles, Joban's owner, about the condition of its trucks. In response, Beliles threatened to "see to it that Varney was fired."

As a result of the OTR drivers' complaints, on January 13, 1976, plant manager Dorsch convened a meeting with Beliles and OTR drivers James Wade and Varney to seek a solution to the truck maintenance problems. Varney complained of the condition of the trucks and compared them unfavorably with Fry's prior equipment. Wade agreed. Beliles promised that new equip-

---

ment would be provided in the spring. Dorsch stated that no driver need operate an unsafe vehicle, but that they would have to continue to use Joban's trucks. Beliles agreed to make repairs provided the complaints were in writing. As a consequence, Dorsch instituted an "Equipment Complaint Report" to be completed by the OTR drivers after each trip. After the meeting, Beliles again threatened Varney to "see to it that he is fired."

The Equipment Complaint Report proved ineffective. Beliles ignored Equipment Complaint Reports listing defective lights, faulty transmissions, faulty steering wheels, maladjusted or inoperative brakes, and broken speedometers. On one occasion, Beliles tore up several forms. At Varney's instigation, Dorsch was told of Beliles' disregard for the Equipment Complaint Report.

In addition to filing Equipment Complaint Reports, Varney used the "Driver Vehicle Condition Report" on the back of the daily log form required by regulations of the Federal Highway Administration to note mechanical problems with Joban's trucks. Driver Vehicle Condition Reports provide for certification by the mechanic that the defect has been repaired before further use of the vehicle. Though Varney submitted several such reports, the required repairs were not made.

Varney also asked Dorsch to have Joban's trucks inspected by the Ohio Public Utilities Commission or by the Federal Highway Administration. Varney agreed to stop complaining if the trucks were inspected. Dorsch refused.

In early March, 1976, three of the four OTR drivers complained orally to Dorsch about Joban's trucks. Varney threatened not to drive the trucks unless they were fixed. Shortly thereafter, an OTR driver quit because he was tired of driving Joban's trucks.

On April 14, Varney was assigned to deliver a load in Pennsylvania. Joban's mechanic told Varney that the truck had new brakes. During Varney's trip, the brakes on the truck failed and he had a three-vehicle accident. In a telephone conversation with office manager Bauer, an emergency road service mechanic stated that the brakes were defective. Bauer and Dorsch told Varney that the accident was not his fault.

The day after the accident, Beliles called Dorsch and threatened to "pull all of his equipment out unless they get rid of Varney." On April 19, Dorsch convened another meeting. Varney complained about the condition of Joban's trucks. Beliles accused Varney of deliberately abusing Joban's trucks. Beliles reiterated his oft-repeated threat that Varney be fired. Dorsch "refused," but gave Varney an "ultimatum." Dorsch then presented to Varney for his signature a statement, already prepared, putting him on probation for six months.[1] Dorsch read the statement aloud. Bauer advised Varney that if he signed it he would be admitting to the violations set forth in it. Varney refused to sign. Dorsch told Varney to sign the statement or be terminated. After the meeting, Bauer conferred privately with Varney and told

---

1. This statement is as follows:

**STATEMENT**

I, James I. Varney, Hereby acknowledge that, effective April 19, 1976, I shall begin a *driver's probationary period* of six months, with the Medina Plant of Lloyd A. Fry Roofing Company of Delaware, Inc. During the period April 19, 1976 through October 19, 1976, I fully understand that I will be subject to the closest scrutiny by plant management, and plant employees and agents, of my driving ability (speeding (sic) tickets, accidents, breakdowns) and my treatment of the Equipment provided me by my plant management. In addition, I understand that I will be judged on my ability to take loads out of the plant at the time scheduled by plant management. I will also be judged on my ability to deliver these loads at the time promised. My treatment of customers and their employees will be scrutinized. The time required for me to return to the plant and be ready for another trip will be monitored. The condition of my returned empty trailer with regard to its convenient re-loading by the plant shipping department will be reported to plant management. I shall *promptly* report, *in writing*, all equipment deficiencies to the agents of our leasing company, who are responsible for vehicle maintenance. I understand that these same agents will report to my plant management all equipment defects *not* reported by me, or reported by me late, causing a scheduled trip to be delayed. I completely understand that I am subject to immediate dismissal by plant management during my probation period.

x......................          x.....................
Signature James L. Varney          Date of Signature

x......................
Witness

Copy: R. W. Manges - Ass't MGR. (West)
G. O. Galloway - Ass't MGR. (East)
M. S. Queen - Plant Supt.
W. E. Barnes - Ass't Supt.
C. W. Bauer - Office Mgr.
V. C. Spires - Trans. Clerk
E. Bailey - Foreman
J. M. Myers - Foreman
R. R. Streck - Shipping Clerk
D. A. Triplett - Ass't Shipper
E. L. Chapman - Pers. Clerk
J. Beliles - Joban Leasing, Inc.
D. Biddle - Joban Leasing, Inc.
R. L. Lantz - Senior Driver
D. Mathers - Fry Driver
E. Miller - Fry Driver
J. L. Varney - Fry Driver
J. R. Dorsch - Plant MGR.

him that he would be foolish to sign the statement. Varney again refused to sign the statement and was fired.

Varney filed an unfair labor practice charge with the Board alleging that he was discharged for exercising rights protected by section 7 of the Act. After a hearing, an Administrative Law Judge held that Varney's participation in meetings convened by Fry, use of the Equipment Maintenance Report, and efforts to enforce compliance with governmental safety regulations were related to a common concern of all OTR drivers. As a consequence, the ALJ held that Varney was engaged in protected concerted activities within the meaning of section 7 of the Act.[2]

The ALJ concluded that Varney was subjected to "excessively harsh and unwarranted probationary status" because of his concerted activity respecting the safety of Joban's trucks. Fry's proffered justification that Varney was discharged because he failed to tie down cargo, was tardy in deliveries, had poor customer relations, and drove carelessly were found to be pretextual.

## II.

Section 7 of the Act provides that "employees shall have the right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Employees may engage in concerted activities protected by section 7 regardless of whether the employees are members of a union. *Vic Tanny International, Inc. v. NLRB,* 622 F.2d 237, 241 (6th Cir. 1980).

An individual employee's complaint is "concerted" if it is related to group action for the mutual aid or protection of other employees. *Signal Oil & Gas Co. v. NLRB,* 390 F.2d 338, 342–43 (9th Cir. 1968). Either the individual employee "is in fact acting on behalf of, or as a representative of, other employees," *NLRB v. Guernsey-Muskingum*

*Electric Cooperative, Inc.,* 28 F.2d 8, 12–13 (6th Cir. 1960), or his claim "must be made with the object of inducing or preparing for group action," *Aro, Inc. v. NLRB,* 596 F.2d 713, 718 (6th Cir. 1979). It is not necessary that the individual employee be appointed or nominated by other employees to represent their interests.

Protests of wages, hours, other working conditions and the presentation of job-related grievances are for the mutual aid and protection of employees. *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); *Vic Tanny, supra,* 622 F.2d at 241; *NLRB v. Elias Brothers Restaurants,* 496 F.2d 1165 (6th Cir. 1974). Additionally, an employee's presentation of job-related grievances aimed at achieving employer compliance with governmental regulations affecting working conditions is for the mutual aid and protection of employees. *Socony Mobil Oil Co. v. NLRB,* 357 F.2d 662 (2d Cir. 1966). *Alleluia Cushion Co.,* 221 NLRB No. 999 (1975). Applying these principles, we hold that Varney was engaged in concerted activity protected by section 7 of the Act.

Varney was engaged in numerous discussions with other OTR drivers regarding their personal safety, which was a major issue at Fry. Varney expressed his concern to Fry's management that Joban's trucks were unsafe. Varney articulated his and the other drivers' concerns at meetings between the OTR drivers and Fry's management. Varney's continued use of the Equipment Complaint Report and the Federal Highway Administration's Driver Vehicle Condition Report to eliminate safety hazards on Joban's trucks was for the mutual aid or protection of other employees. His attempt to enforce federal safety and state inspection regulations is protected concerted activity. Such regulations are intended to provide *all* employees with a safe job environment and the means to protect themselves against job hazards.

2. Additionally, the ALJ held that the agreement between Fry and the OTR drivers to institute the "Equipment Complaint Reports" was analogous to a limited collective bargaining agreement which the OTR drivers were entitled to enforce. Because of our resolution of the other issues on appeal, we do not reach this issue.

## III.

■ Section 8(a)(1) of the Act makes it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of ..." their section 7 rights. 29 U.S.C. § 158(a)(1). In this Circuit, if a discharge is motivated "in part" by an employee's protected concerted activities the discharge violates section 8(a)(1) of the Act. *Vic Tanny, supra,* 622 F.2d at 241; *NLRB v. Retail Store Employees Union, Local 876, Retail Clerks International Association, AFL–CIO,* 570 F.2d 586, 590 (6th Cir. 1978). *Elias Brothers Restaurants, supra,* 496 F.2d at 1167. *But see, NLRB v. Ogle Protection Service,* 375 F.2d 497 (6th Cir.) *cert. denied,* 389 U.S. 843 (1967). In *Wright Line,* 251 NLRB No. 150 (1980), the Board has reexamined its use of the "in part" test in light of the decision in *Mt. Healthy Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1979). The Supreme Court in *Mt. Healthy* fashioned a "test of causation which distinguishes between a result caused by [protected concerted activity] and one not so caused." 429 U.S. at 286, 97 S.Ct. at 575. The Court reasoned that "[t]he [section 7 right of an employee] is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct," *Id.* at 285–86, 97 S.Ct. at 575. *Wright Line* adopts a test of causation parallel to that set forth in *Mt. Healthy*:

> The general counsel establishes a *prima facie* case that protected concerted activity was a "motivating factor" in the employer's decision; then, the burden shifts to the employer's decision; then, the burden shifts to the employer to prove that the same action would have taken place in the absence of the protected concerted activity.

251 NLRB at 20. Applying these principles to this case, we hold that the facts compel the conclusion that Varney would not have been discharged *but for* his protected activity.

It is beyond peradventure that Varney was constructively discharged on April 19. Beliles vigorously opposed Varney's concert-ed activity to improve Joban's equipment. He told Dorsch that Varney's April 14 accident was "the last straw." Though Dorsch stated Varney was not at fault for the accident, Dorsch adopted Beliles' opposition to Varney's concerted efforts by requiring him to sign a probationary statement which suggested that Varney was guilty of its detailed provisions.

Fry claims that Varney was discharged because of his careless driving, tardy departures and deliveries, treatment of customers and abuse of Joban's equipment. However, substantial evidence supports the Board's finding that Fry has failed to demonstrate that it would have discharged Varney in the absence of his engaging in protected concerted activities.

Varney had only one accident prior to his accident on April 14, which Dorsch admitted was not Varney's fault. He received two tickets for traffic violations in the summer of 1975, but Fry took no action at that time. Most of the truck breakdowns were due to equipment failures. Tardy departures and deliveries were related to equipment defects. There is no evidence that Varney abused Joban's trucks. A customer once reported that a young driver wearing cowboy boots was rude. Though Dorsch testified that he concluded Varney was the driver in question, the ALJ specifically discredited Dorsch's testimony.

Varney was repeatedly reprimanded because he failed to properly stack and tie down the loading pallets and temporary plywood sides of the flat bed trucks after making a delivery. However, after each reprimand, Varney would comply with the proper procedures. Additionally, the ALJ held that nothing unusual occurred immediately preceding April 19 to make Varney's conduct a crucial matter. Consequently, Varney's disregard for the condition of his truck after making deliveries was not, standing alone, a crucial matter for which he would have been discharged.

Accordingly, the Board's order is ENFORCED.