849 F.2d 609
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MCI MINING CORPORATION, Respondent.
 No. 87-5679.
 United States Court of Appeals, Sixth Circuit.
 June 16, 1988.
 
 Before MILBURN and BOGGS, Circuit Judges, and ANN ALDRICH, District Judge.*
 PER CURIAM:
 
 
 1
 The National Labor Relations Board (NLRB) seeks enforcement of its Decision and Order against MCI Mining Corporation (MCI). MCI is a coal mining company incorporated in Kentucky, with a principal place of business in Bulan, Kentucky. Star Fire and Lost Mountain are divisions of MCI.
 
 
 2
 On July 8 and 9, 1986, an unfair labor practice hearing was held in Hazard, Kentucky, before ALJ Beddow, to determine whether MCI had violated Sec. 8(a)(1) of the Labor-Management Relations Act, 29 U.S.C. Sec. 158(a)(1), in response to a work stoppage which occurred at Star Fire Mining Company (Star Fire), Lost Mountain Mining Company (Lost Mountain), and Buckhorn Processing Company, a related coal processing company.
 
 
 3
 In a decision dated December 15, 1986, ALJ Beddow found that MCI violated 29 U.S.C. Sec. 158(a)(1) by:
 
 
 4
 (1) suspending employees Jett and Campbell, and discharging employee Combs because they engaged in protected concerted activities;
 
 
 5
 (2) maintaining a rule that employees would be disciplined for initiating work disruptions;
 
 
 6
 (3) threatening employees with discharge if they did not end a lawful strike.
 
 
 7
 MCI filed exceptions with the NLRB, but in a Decision and Order, dated April 21, 1987, the Board affirmed the ALJ Bedow's rulings, findings, and conclusions with only minor modification.
 
 
 8
 We affirm the decision, and grant enforcement of its order.
 
 
 9
 * We begin by providing a short history of labor-management dispute at MCI.
 
 
 10
 In January and February 1985, a three-week work stoppage occurred at Star Fire, precipitated by the discharge of an employee for failing to comply with the company's hard-hat policy. The strike ended after negotiations led to changes in the hard-hat policy. On February 13, 1985, MCI proposed a seniority policy establishing the positions of "Mechanic I" and "Mechanic II." Mechanic II was the training position for the more advanced position of Mechanic I. On April 18, 1985, MCI issued this seniority policy over the vigorous objections of employees; the employees threatened to strike. On April 22, 1985, MCI relented and issued a revised seniority policy.
 
 
 11
 During a lay-off in May 1985, MCI, without employee consent, created a training position called "Repairman" (essentially equivalent to the previously proposed Mechanic II). Employees Sloane, Spence, Fredericks and Osborn were each given such a Repairman position. At this time, employee spokesman Mullins and employee Jett objected to what they saw as an attempt by MCI to circumvent the terms of the previous agreement of April 22, 1985. Strikes occurred during the summer and fall of 1985.
 
 
 12
 On October 8, 1985, MCI issued a "work-stoppage rule" which prohibited individuals from initiating any work-stoppages under penalty of disciplinary action, including discharge.
 
 
 13
 In January 1986, Sloane was transferred from the second shift to the day shift. Employee Combs felt that he should have been transferred instead of Sloane because Combs felt that he had more "job line seniority." Combs voiced his complaint to several members of MCI management, arguing that since mechanics and repairmen were in the same job line, he had more seniority than Sloane. Combs's complaint was denied on the ground that MCI's decision to move Sloane was in accordance with the company's revised seniority policy. Record evidence suggests that Combs's problem received the attention of MCI employees generally.
 
 
 14
 In March 1986, MCI transferred another repairman, Fredericks, to the day shift. Combs immediately complained to MCI management about the transfer. He argued that the transfer of Fredericks to the day shift violated his job line seniority because it moved a less-senior repairman around him.
 
 
 15
 Combs then requested a meeting with the mine manager, Migliaccio. In the following week, Combs and Mullins met with Migliaccio and with Maynard, the Human Resources Representative for MCI. Mullins argued that the Repairman position should be abolished because MCI had previously agreed not to create the position, and that if the Repairman position were not abolished, it should at least be put in the same job line for seniority purposes as the Mechanic position. The next day Mullins gave Maynard a document purporting to prove that the employees had previously rejected the Mechanic I and Mechanic II positions.
 
 
 16
 On March 31, the next week, Mullins met with Migliaccio alone and again discussed the seniority policy problems. Migliaccio indicated that he would uphold MCI's original position that mechanics and repairmen were two distinct job lines for seniority purposes. Mullins stated that such a decision could lead to a strike.
 
 
 17
 During the evening of March 31, Migliaccio met with over seventy employees on the first and second shifts. Combs, Mullins, and many other employees, voiced their belief that MCI had violated the seniority agreement. Migliaccio held a similar meeting with third shift employees. At that meeting, Roger Jett, a third shift equipment operator, confirmed that he and other employees were concerned over the creation of the Repairman job. Wayne Campbell told Migliaccio that mechanics and repairmen were in the same job line for seniority purposes, and that he and other mechanics were being affected by recent MCI management decisions to bypass mechanics in favor of repairmen.
 
 
 18
 Shortly thereafter, employee Nix told Migliaccio that if the job line seniority problem were not addressed, he would "go to the foot of the hill" (meaning that he would precipitate a strike). Migliaccio told Combs that "[m]y decision won't make you happy." Combs, after returning to his work area, informed the other four mechanics of Migliaccio's decision, and they agreed that it was time to strike.
 
 
 19
 On April 8, 1986, Combs went to the "foot of the hill" between 5:30 and 6:00 A.M. and began informing Star Fire employees that it was time to strike. Only one employee went to the job-site. Between fifty and one hundred employees joined the picket line.
 
 
 20
 Both Migliaccio and Maynard went to the site of the strike. Maynard testified that when she asked Combs what was going on, he replied that "[i]t's about this repairman thing, Sharon. I'm the one that stopped these boys here." Migliaccio told the employees that there was a company policy against work-stoppages, and asked that they return to work. Combs testified that someone then said that "[y]ou all won't listen until we come down to the bottom of the hill." When Migliaccio accused Combs of instigating the strike, employee Engle spoke up and told Migliaccio " '[h]e didn't stop me, we stopped ourselves. He wasn't the one that stopped us, because we knowed what was going on.' "
 
 
 21
 Several employees attempted to discuss the seniority problems with Migliaccio. No agreement was reached. Later on that day, employees from Lost Mountain informed the Star Fire strikers that they would support their strike if they would send a few Star Fire employees over to the Lost Mountain job site.
 
 
 22
 Later that evening Migliaccio informed Combs that he was suspended for period of ten working days for causing a work-stoppage, and warned that continuing to disrupt productivity would end in discharge. Combs then went to speak with an employee spokesman for Lost Mountain who indicated that employees at Lost Mountain would support the Star Fire employees on the condition that some Star Fire employees come over to the Lost Mountain site. The next morning Combs went to the Lost Mountain site. Soon thereafter employees Campbell and Jett arrived, as well as two Lost Mountain employee spokesmen. They began stopping employees as they arrived for work. Most employees refused to work. Maynard and the new Human Resources manager, Manzanares, arrived on the scene and spoke with Combs, Campbell, and Jett. Combs told Manzanares that Star Fire was violating the job-line seniority.
 
 
 23
 The same evening a termination letter was sent to Combs's home which stated that he was fired "because of your continued activities in causing further work stoppages at the Lost Mountain Mining and Buckhorn Processing operations." When Campbell and Jett reported for work on April 11, 1986, they were informed that they were suspended for ten days as "as a disciplinary action ... for causing a work stoppage at Lost Mountain and Buckhorn Processing."
 
 II
 
 24
 Chapter 7 of the Labor-Management Relations Act grants employees "the right to self-organization ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ...." 29 U.S.C. Sec. 157. In NLRB v. Washington Aluminum Co., 370 U.S. 9, 12-14 (1961), the Supreme Court held that Chapter 7 rights extend to unorganized employees as well as to employees represented by a union. An employer's interference with, or restraint of, employees' exercising Chapter 7 rights violates 29 U.S.C. Sec. 158(a)(1). Chapter 7 protects "concerted" employee activity for "mutual aid or protection." The Court has indicated that the statutory term "mutual aid or protection" should be liberally construed to protect concerted activities directed at a wide range of employee concerns. Eastex, Inc. v. NLRB, 437 U.S. 556, 563-68, 567 n. 17 (1978). "[I]f they might reasonably be expected to affect terms or conditions of employment," concerted activities are protected by Chapter 7. Brown & Root, Inc. v. NLRB, 634 F.2d 816, 818 (5th Cir. Unit A Jan. 1981) (per curiam). This Circuit has held that seniority is a "valuable" working condition. Metal Blast, Inc. v. NLRB, 324 F.2d 602, 603 (6th Cir.1963) (per curiam). Thus, employees' concerted activities directed at protecting their seniority rights are protected by the Act.
 
 
 25
 An employer violates 29 U.S.C. Sec. 158(a)(1) of the Act if it discharges, disciplines, or threatens to discipline employees for participating in or initiating concerted activity, such as a strike. Vic Tanny Int'l, Inc. v. NLRB, 622 F.2d 237 (6th Cir.1980). In Delchamps, Inc. v. NLRB, 585 F.2d 91, 93 (5th Cir.1978), the Fifth Circuit held that an an employer's threat to discharge employees about to engage in concerted activity protected by Chapter 7 was unlawful.
 
 
 26
 In Bay-Wood Industries, Inc. v. NLRB, 666 F.2d 1011, 1012 (6th Cir.1981) (per curiam), this Circuit held that Chapter 7 protects not only "mature" concerted activity, i.e., strikes, but also nascent concerted activity, such as discussions and preparations for a strike. In Mushroom Transp. Co. v. NLRB, 330 F.2d 683, 685 (3d Cir.1964), the Third Circuit recognized that to protect concerted activities, protection must be extended to "intended, contemplated, or even referred to" group action. If it were not so extended, "employer retaliation [would] destroy the bud of employee initiative aimed at bettering terms of employment and working conditions." Hugh H. Wilson Corp. v. NLRB, 414 F.2d 1345, 1347 (3d Cir.1969), cert. denied, 397 U.S. 935 (1970). Thus, " '[t]he activity of a single employee in enlisting the support of his fellow employees for their mutual aid and protection is as much 'concerted activity' as is ordinary group activity.' " Empire Gas, Inc., 224 NLRB 628, 630 (1976) (quoting Owens-Corning Fiberglas Corp. v. NLRB, 407 F.2d 1357, 1365 (4th Cir.1969)), enf'd, 566 F.2d 681 (10th Cir.1977).
 
 
 27
 In McLean Trucking Co. v. NLRB, 689 F.2d 605, 609 (6th Cir.1982) this Circuit established a three part test for determining "concertedness" under Chapter 7 of the Labor-Management Relations Act, 29 U.S.C. Sec. 157: (1) the substance of the employee's activities should be examined with an eye toward the question of whether he or she acted alone; (2) the degree of union involvement should be examined; and (3) the subject of the employee's complaint should be analyzed with a view toward whether it was merely a personal dispute. The ALJ determined that Combs, Jett and Campbell were engaged in concerted activity, and therefore legally protected from any disciplinary action from MCI. The Board affirmed this finding. This court must review this finding of concerted activity under a substantial evidence standard. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). We find that substantial evidence in the record exists to support the NLRB finding that Combs, Jett and Campbell were engaged in "concerted activity."
 
 III
 
 28
 As its main argument on appeal, MCI maintains that substantial evidence in the record as a whole does not support the determination that employees Combs, Jett and Campbell engaged in protected activity for which they could not have been lawfully discharged or suspended by MCI. MCI argues that it is clear that Combs acted alone "in voicing his complaints to management and eventually instigating the strike." MCI further argues that "[Combs's] complaint involved a personal dispute, the purpose of which was to benefit only himself." MCI argues that while the April 1986 strike may appear to be classic concerted activity, "in fact it was the result of a purely personal gripe by one man, Raymond Combs, which escalated into a work stoppage because historically one employee can create a work stoppage at Star Fire, Lost Mountain and Buckhorn Processing by simply going to the 'bottom of the hill' and stopping other employees." In MCI's view, the cause of the strike was Combs's "selfish desire to transfer from second shift to first shift, a transfer which could only have been possible if the mechanic and repairman job lines were merged." MCI argues that "the only specific complaint about this issue heard by employee Ed Mullins ... or by mine managers Harris and Migliaccio" was from Combs.
 
 
 29
 Moreover, MCI argues, MCI management was convinced that Combs's activities were purely and solely personal, lacking any concertedness. MCI asserts that Combs "confessed to vice-president Slack that he had no employee support for his position."
 
 
 30
 The record shows, however, that Combs testified that he never told Slack that there was no employee support for his grievance. MCI itself stated in its brief: "[e]mployee Mullins stated to mine manager Migliaccio that his reason for not complaining about the repairman position until a year after its creation was that because Combs was now complaining and that were it not for Combs there would be no discussion concerning such position." Moreover, what the company believes or does not believe is, in our view, largely irrelevant to the objective question of whether "concerted activity" as defined in the NLRA occurred.
 
 
 31
 We agree with the Board that MCI's arguments are based on "several fundamental misconceptions." As the Board correctly held, "it is clear that the strike, with 300 employees participating at both locations, was a continuation of the employees (sic) concerted complaints, regardless of the fact that it was precipitated by management's refusal to reconsider the alleged bypassing of one particular employee." The record clearly shows that Combs acted in actual concert with others. Record evidence supports the Board's finding that after learning that he had been bypassed a second time for a first shift opening, Combs consulted Mullins, the employees' spokesman.
 
 
 32
 The record shows that "Mullins not only advised Combs to first '[g]o talk to [management] ... and see what you can come up with,' but also offered Combs his assistance if it subsequently proved to be needed ...." We agree with the Board that "[w]hen Combs was unable to resolve the dispute on his own, Mullins became involved and the two employees jointly met with management in an effort to resolve the dispute."
 
 
 33
 Concertedness of action is clear from the fact that "[a]fter Migliaccio's announcement on March 31 that the Company was going to follow its original decision with regard to filling the first shift repairman vacancy, a group of employees decided then that it was time to strike." Even though his fellow employees decided then that it was time to strike, Combs was able to convince them otherwise. Such control could only arise in a concerted situation. When Migliaccio confirmed his original decision, Combs consulted his fellow mechanics, and they collectively decided that the strike would begin the next morning. Thus, the record contains ample evidence of concertedness.
 
 
 34
 The Board argues that the actions of Combs, Campbell, Jett and other employees must be placed in the context of the history of labor-management dispute at MCI, despite MCI's attempts at isolating the activities of Combs, Jett and Campbell. We agree with the Board. Collective concern about job-bidding and seniority issues was first voiced during and subsequent to an early 1985 strike. In the strike settlement, MCI had acknowledged that job-bidding and other seniority policies needed to be clarified and agreed to provide for communications committee review of these policies before implementation. As the Board states, in April 1985 the employees defeated the Company's attempt to establish the "Repairman" position (essentially equivalent to previously proposed and defeated Mechanic II position), first by objecting to the proposal without consequence, and second by threatening to strike if MCI proceeded with implementation. In May 1985, communications committee members Mullins and Jett objected, and Mullins asserted that MCI had agreed not to implement training positions without the previous approval of communications committee employees. The Board points out that Jett had previously warned MCI management that MCI's actions would lead to a strike. On April 8, 1986, a strike in fact occurred.
 
 
 35
 In our view, MCI announcements in January 1986 and March 1986 of selections for repairman vacancies only revived previously articulated employee concerns and complaints about job line seniority concerning the repairman and mechanic positions. Combs voiced a complaint that those selections were unfair and violated the 1985 agreement. Mullins represented Combs before MCI management, and indicated to Sharon Maynard, employee relations person, that the employees had never previously approved of the repairman position. Other employees raised similar concerns that they had been by-passed because MCI only considered repairman seniority in filling vacancies in the first shift. Mullins testified that there was a "general feeling" that MCI "had violated [the] seniority agreement" by giving priority to repairmen over mechanics. MCI's March 31 announcement denying Combs's grievance revived strike threats made eleven months earlier. What MCI views as purely individualized action on Combs's part was instead the "catalyst" for consequent protected concerted activity designed to address and resolve collective historical dissatisfaction with MCI's position on job line seniority.
 
 
 36
 As to the disclaimer of actual knowledge by MCI about the collective discontent concerning seniority policy, we uphold the Board's determination that it is not credible given the history of the labor dispute and the many instances in which MCI employees informed MCI management of their concern over job line seniority of repairmen and mechanics.
 
 IV
 
 37
 MCI also argues that it did not promulgate and maintain a rule subjecting all employees to discipline up to and including discharge if they engaged in a work stoppage, in violation of Sec. 8(a)(1).
 
 
 38
 MCI argues that the rule was not targeted at all employees who engaged in a work stoppage. Instead, MCI argues that its rule was "narrowly and expressly confined to 'individuals involved in initiating any such disruptions....' " (emphasis supplied) MCI's arguments are premised on the assumption that the activities of Combs, Jett, and Campbell in "initiating" a strike were unprotected. However, such activities were protected, just as much as those of the subsequent strikers. The rule thus violates Sec. 8(a)(1), as MCI admits that the rule was intended and did apply to activities of Combs, Jett, and Campbell.
 
 
 39
 Because the record contains ample evidence of "concerted activity" on the part of Combs, Jett and Campbell and other MCI employees, the findings of the Board are AFFIRMED, and enforcement of the NLRB order against MCI is GRANTED.
 
 
 
 *
 Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation