**GATLIFF COAL COMPANY, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

**Nos. 91–5309, 91–5482.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 14, 1991.

Decided Jan. 8, 1992.

Robert L. Thompson (briefed), Joseph M. Freeman (argued & briefed), Elarbee, Thompson & Trapnell, Atlanta, Ga., for Gatliff Coal Co.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, John C. Truesdale, Executive Secretary, Judith A. Dowd, Jerry M. Hunter, Acting Gen. Counsel, Marilyn O'Rourke (argued & briefed), N.L.R.B., Washington, D.C., James L. Ferree, N.L.R.B., Cincinnati, Ohio, for N.L.R.B.

Before MARTIN and SUHRHEINRICH, Circuit Judges, and HILLMAN, Senior District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

Gatliff Coal Company appeals the National Labor Relations Board's finding that

Gatliff. violated § 8(a)(1) of the National Labor Relations Act by discharging two employees for engaging in protected concerted activities. The Board has ordered Gatliff to offer the two employees, Rebecca Carpenter and Diane Taylor, immediate and full reinstatement, to make them whole for any loss of earnings or benefits suffered as a result of their discharge, and to expunge from Gatliff files any reference to the discharges. Gatliff argues that it discharged Carpenter and Taylor for lawful reasons rather than unlawful reasons. Because we find the Board's conclusions are reasonable under the appropriate standard of review, we affirm.

## I. FACTS

The facts are set forth in exacting detail in the administrative law judge's decision and are incorporated in the Board's order. We summarize the essential facts as follows.

Rebecca Carpenter began her employment with Gatliff in August, 1987, as a receptionist and switchboard operator. Diane Taylor began her employment in June, 1979, and was a payroll clerk for the three years immediately preceding her termination. Both women were given excellent ratings on job understanding, performance, productivity, dependability, and cooperation on their annual evaluations from September, 1988. These evaluations were signed by William Stark and Clark Taylor, the two women's supervisors.

In the Spring of 1989, rumors about Carpenter and Diane Taylor engaging in extramarital sexual conduct with Larry Strunk, another Gatliff employee, began to surface. The rumor was started by two women, Vickie Croley and Karen Hamblin. Strunk had recently ended a personal relationship with Croley, who was pregnant and claimed that Strunk was the father. William Stark, who had also dated Vickie Croley, resented Strunk's treatment of Croley, and gossiped to others about Strunk. Ms. Taylor and

* The Honorable Douglas W. Hillman, Senior United States District Judge for the Western District of Michigan, sitting by designation.

Ms. Carpenter apparently sided with Strunk in his decision to end his relationship with Croley.

Ms. Carpenter eventually approached Hamblin and requested an end to the rumor-mongering. She later advised Clark Taylor of this action and he told Carpenter to ignore the rumor. Ms. Taylor similarly approached Croley and Hamblin and requested they stop circulating the false rumor regarding Strunk and herself. On August 13, 1989, Ms. Taylor told Stark what she had done and he told her not to worry about the rumor and that it would eventually die down.

On August 15, Stark advised Carpenter and Diane Taylor that the rumor was not dying down and that Clark Taylor had said they should be fired as an example. However, because the two women had done good work in the past, Stark claimed that he was able to talk Clark Taylor out of firing them. Stark then advised the two women to simply stay in their offices, refrain from using the phones for non-business use, and to report to himself, Clark Taylor, or Deborah Huddleston, if they had to leave the accounting department.

The two women decided to talk to Clark Taylor because they feared losing their jobs but Taylor was unavailable. The two women were able, however to meet with Jim Shackleford, the President of Gatliff, the next morning. They told Shackleford of their concerns that they might be fired to stop a rumor and Shackleford assured them they could not be fired to set an example. He declined to talk to Croley or Hamblin, however, and said the rumor would die out by itself. On August 18, Clark Taylor met with the two women and denied telling Stark he wanted to fire them. All three then met with Stark and it was again stated that the rumor should blow over and the two women should simply stay in their work areas to avoid trouble.

On September 26, the two women were fired in separate meetings with Clark Taylor, Jim Faulkner, and Jim Shackleford. According to Gatliff, Ms. Taylor was fired for insubordination to Stark and for being away from her work area. Other reasons for her firing were raised at the meeting and included: 1) that she misused the phone; 2) that she was uncooperative; 3) that she had failed to order checks six months earlier; and 4) that she was hindering Larry Strunk's work performance by calling him and visiting his office. Ms. Carpenter was fired for being away from her work area, for a decline in her productivity, and for allegedly incorrectly typing a letter the week before. Larry Strunk was fired the same day.

## II.  THE BOARD'S FINDINGS

The Board made several findings regarding the specific criticisms of the women's job performance. First, the Board found that Ms. Taylor's failure to order the checks was a serious error and did result in a reprimand. This written reprimand indicated, however, that Stark felt Ms. Taylor might not be ultimately responsible for the mistake because of the system in place. Next, the Board disbelieved Gatliff's contention that it took Carpenter two and one-half hours to type a letter. The Board found that it took Ms. Carpenter one-half hour to do the assignment, that she then went to the dentist, and that while she was gone someone else re-typed the letter based on the original draft and not the draft given to Ms. Carpenter. Regarding the two women's allegedly excessive absences from the work-place, the Board noted that several of the parties who supposedly complained about the absences did not testify. Further, even those parties who did testify, testified in a general manner and did not clearly indicate just where the women went when they left their department or how often they did so. In most instances, these witnesses had never complained to Gatliff at the time the alleged absences occurred but only did so much later. Strunk testified that the women who had started the rumor about Taylor and Carpenter visited his office more than anyone. This testimony was uncontroverted and, in the Board's view, further weakened the credibility of the evidence concerning Taylor and Carpenter's allegedly excessive absenteeism. The Board also found that the allegations of

phone misuse and insubordination were unsupported. Taylor only received two or three personal calls from mid-August till September 26 while, ironically, Croley received as many as seven personal calls a day and yet was not chastised for such. Finally, the Board found the insubordination claim was vague and not adequately explained by Stark. Strunk's discharge the same day as the two women suggested to the Board that the discharges were a device designed to stifle the rumor with which the women had expressed concern.

The Board found that the preparation of the last performance review was particularly suggestive. Stark originally stated on both women's review that they have "the capabilities of being" good or excellent employees. When Taylor received these reviews he asked Stark to be more specific and to explain why the women were not good or excellent employees at the present time. Stark then wrote out on separate pages specific criticisms about the present status of the women's work. When the women were discharged, Taylor told them that it was based on Stark's reports. The Board found Taylor's behavior in this regard suspicious because it was Taylor who insisted Stark issue the adverse evaluations and, ironically, Stark's evaluations did not recommend the two women be dismissed. The Board concluded that it was Clark Taylor, not William Stark, who wanted to fire the two women and that Taylor's insistence on the adverse evaluations was designed to provide a plausible basis for the discharges. Taylor claimed that Shackleford made the discharge decision. The Board found that in the absence of corroborating testimony from Shackleford, Taylor's claim was not credible.

Much of the Board's findings necessarily relied upon inferences and credibility determinations. The Board found that Gatliff's failure to call several of its employees as witnesses warranted an inference that their testimony would not have supported Gatliff's position. The persons not called to testify included Jim Shackleford, the president, Jim Faulkner, the personnel director, Fred Maggard, the Vice President, and Bob Zik, the Production Manager. All of these

men had allegedly complained of the women's job performance and Shackleford and Faulkner played critical roles in the decision to discharge the women. The Board expressly found that Carpenter and Diane Taylor were impressive witnesses while Stark and Clark Taylor gave "meandering and circumlocutory testimony couched largely in generalities with respect to critical matters." Accordingly, the Board would not credit Stark or Clark Taylor's testimony where it conflicted with the testimony of Carpenter or Diane Taylor.

The Board's findings represent a complete affirmation of the administrative law judge's initial determination in this matter. The Board, in its review of the administrative law judge's opinion, acknowledged Gatliff's dispute with the judge's credibility findings. Nonetheless, the Board stated that it would not overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinced the Board the judge's findings were incorrect. A careful review of the record did not so persuade the Board.

## III.  APPLICABILITY OF SECTION 8(a)(1)

### A.  Standard of Review

■ Our review of the Board's findings of fact is limited to determining whether those findings are supported by "substantial evidence" in the record. *NLRB v. Brown–Graves Lumber*, 949 F.2d 194, 196 (6th Cir.1991). We also use the substantial evidence standard in reviewing the Board's application of law to the facts. *Id.* at 196–197. On appeal, we may not disturb the Board's findings where there is substantial evidence in the record as a whole to support the Board's conclusions. *Id.* at 196. Such conclusions may not be disturbed even if we could justifiably have made a different choice judging the matter de novo. *Id.* In determining whether evidence is substantial, we must take into account anything in the record which fairly detracts from the weight of the evidence. *Id.* Evidence is considered substantial if it

is adequate to a reasonable mind to uphold the decision. *Id.*

## B. Finding of Concerted Action

■ Gatliff first argues that the Board erred in relying exclusively on *N.L.R.B. v. Leslie Metal Arts Co.*, 509 F.2d 811 (6th Cir.1975), to support its determination that Diane Taylor and Carpenter were engaged in a concerted activity under § 7. According to Gatliff, *Leslie Metal Arts* is markedly different from the instant case because in *Leslie*, the dispute hinged on a threat to the employees' physical safety. The court in *Leslie Metal Arts* held that the mere personal animosity which existed between the employees was insufficient for § 7 protection. According to Gatliff, the Board is trying to transform the instant case into an unfair labor practice case by classifying the rumors as sexual harassment.

The Board found that the actions were concerted because the women joined together in concertedly protesting to Jim Shackleford and Clark Taylor about the malicious rumor started by Croley and Hamblin. This concerted protest was protected by the Act because it concerned harassment by fellow employees which created a difficult condition of employment for the two women. *Leslie Metal Arts Co.*, 509 F.2d at 814.

■ We agree that Diane Taylor and Carpenter were engaged in protected concerted activity. Concerted employee activities are protected by § 7 where the activities can reasonably be seen as affecting the terms or conditions of employment. *NLRB v. Lloyd A. Fry Roofing Co., Inc.*, 651 F.2d 442, 445 (6th Cir.1981). The Board determination regarding whether activity was concerted is entitled to considerable deference if it is reasonable. *Dayton Typographic Service, Inc. v. NLRB*, 778 F.2d 1188, 1191 (6th Cir.1985). We find the Board's determination that Diane Taylor and Carpenter engaged in concerted activity was reasonable.

## C. Finding of Unlawful Firing

■ The provisions of section § 8(a)(1) are violated if the employer knew of the concerted activity, if the activity was protected by the Act, and if the adverse employment action—here, discharge—was motivated by the employees' protected concerted action. *Dayton Typographic*, 778 F.2d at 1191. A reviewing court may not displace the Board's choice between conflicting views of the evidence even if the court could justifiably have made a different choice had the matter been before it de novo. *Id.* Here, the Board found that Gatliff violated the Act by discharging Diane Taylor and Carpenter. The circumstances and facts indicated the discharge was based on the women's complaint to President Shackleford about Clark Taylor's threat to discharge the women unless the rumor involving them was put to rest.

Gatliff complains that the Board made erroneous factual findings on virtually all grounds used to support its determination and that Gatliff's own version of events is "undisputed." Gatliff also complains that an unfavorable inference may not be drawn against a party which fails to introduce evidence known to be in its control where, as here, Gatliff claims it had a good faith reason to believe that their opponent had not met its burden of proof.

The Board acknowledged that there was no direct evidence Gatliff discharged the two women because they concertedly complained to Shackleford about the circulation of the rumor. However, unlawful discharge can be proved by circumstantial evidence warranting an inference of unlawful motivation. *NLRB v. Aquatech, Inc.*, 926 F.2d 538, 545 (6th Cir.1991) (circumstantial evidence alone may be sufficient to prove unlawful motive). This is particularly true in cases such as this where employers will not readily admit discharge was due to engagement in protected concerted activities. *Dayton Typographic*, 778 F.2d at 1192.

The Board found that the reasons given by Gatliff for the two women's discharge did not survive close scrutiny and we agree. Various factors are persuasive.

**252**

First, the Board found significant that the two women were not fired until after August 15, when they concertedly complained to the President about Clark Taylor's threat. Second, the Board found that Gatliff's main witnesses, Clark Taylor and William Stark, were not convincing. Third, the Board drew negative inferences about the absence of testimony from witnesses who should have been able to provide supporting testimony for Gatliff. Fourth, the circumstances surrounding Stark's preparation of the unfavorable evaluations at Taylor's direction damaged Gatliff's credibility. Fifth, Taylor's denial that he recommended the firing of the two women, and rather that it was Stark's recommendation, was damaging to Gatliff's position. Sixth, some of the employees who had allegedly complained about Carpenter and Diane Taylor being absent from their work area did not testify about the absences at the hearing. Those employees who did testify stated that other employees who were not discharged were absent from their work areas more often than either Carpenter or Diane Taylor. Seventh, both women were evaluated as "excellent" the year before. Thus, the Board concluded that the change in Stark's view of the women's performance, which followed their concerted protests, was unsupported by a showing of specific, uncooperative conduct, supporting the Board's finding of unlawful motivation. Finally, the Board found that Strunk's discharge the same day was distinguishable from Diane Taylor's and Carpenter's because Clark Taylor threatened to fire the two women prior to the discharge and their concerted action. The Board's findings satisfy our review under the substantial evidence standard.

The Board's application for enforcement is granted.