RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0218P (6th Cir.)
File Name: 00a0218p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONAL LABOR RELATIONS
BOARD,
 *Petitioner/Cross-Respondent,*

 *v.*

MAIN STREET TERRACE CARE
CENTER,
 *Respondent/Cross-Petitioner.*

Nos. 99-5526/5628

On Application for Enforcement and Cross-Petition
for Review of an Order
of the National Labor Relations Board.
No. 9-CA-35620.

Argued: May 5, 2000

Decided and Filed: July 6, 2000

Before: BATCHELDER, MOORE, and BEEZER,[*] Circuit
Judges.

---

[*]The Honorable Robert R. Beezer, Circuit Judge of the United States
Court of Appeals for the Ninth Circuit, sitting by designation.

1

—————————————

**COUNSEL**

**ARGUED:**   J. Randall Richards, Columbus, Ohio, for Respondent.   Andrew J. Krafts, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner. **ON BRIEF:** J. Randall Richards, Geoffrey E. Webster, Columbus, Ohio, for Respondent.   Andrew J. Krafts,   Aileen A. Armstrong, Margaret Ann Gaines, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner.

—————————————

**OPINION**

—————————————

KAREN NELSON MOORE, Circuit Judge.  The National Labor Relations Board (hereinafter "Board") petitions for enforcement of its order finding Main Street Terrace Care Center (hereinafter "Main Street") guilty of unfair labor practices, and Main Street cross-petitions for review of the order.  The questions presented are whether Main Street violated § 8(a)(1) of the National Labor Relations Act (hereinafter "NLRA"), 29 U.S.C. § 158(a)(1), by promulgating a rule prohibiting employees from discussing wages among themselves, and whether Main Street violated § 8(a)(1) by discharging Mary Craig because she engaged in protected concerted activity.  The Board concluded that Main Street violated § 8(a)(1) in both ways.  Because the Board's findings are supported by substantial evidence, we **ENFORCE** the Board's order and **DENY** Main Street's cross-petition for review.

would have been terminated for this behavior regardless of her protected activity.  The Board accepted the ALJ's explanation that Main Street's proffered reasons did not withstand scrutiny: "There was no investigation [of Craig's alleged misconduct], and what Jeffers allegedly said [to Cochran], when examined in the light of the record made herein, would not justify terminating someone." *Main Street*, 1999 WL at \*10.  Main Street's failure to give Craig any warning before terminating her, in contravention of company policy, provides substantial evidence to support the Board's finding. *See NLRB v. Transp. Mgt. Corp.*, 462 U.S. 393, 404 (1983) (finding the Board's conclusion that the employee would not have been discharged in the absence of protected conduct justified in light of evidence that the employee had not been disciplined prior to his termination), *abrogated on other grounds by Director, OWCP v. Greenwich Collieries*, 512 U.S. 267 (1994); *Health Care Logistics, Inc.*, 784 F.2d at 238 (rejecting employer's assertion that employees would have been fired for performance-related reasons even absent their protected activity because neither employee had been warned about any aspect of his work prior to termination); *Dayton Typographic Serv., Inc. v. NLRB*, 778 F.2d 1188, 1193 (6th Cir. 1985) (rejecting employer's argument that employee was laid off for his bad attitude toward work, explaining that both of the alleged incidents in which the employee displayed a bad attitude occurred considerably before his discharge and the employer had not disciplined the employee for these incidents).

### III. CONCLUSION

For the foregoing reasons, we **GRANT** the Board's petition for enforcement of its order finding that Main Street violated § 8(a)(1) and **DENY** Main Street's cross-petition.

1198 (6th Cir. 1996) (sustaining finding of unlawful motivation in part because "in contrast to other employees when confronted [with the same misconduct], Frederick, a nine-year employee with no history of disciplinary problems, was given no opportunity to explain his actions before his termination"); *NLRB v. Aquatech, Inc.*, 926 F.2d 538, 547 (6th Cir. 1991) (noting that "discriminatory application or lax administration of policies may indicate that employees are being singled out for union activities").

Additionally, the timing of Craig's discharge strongly suggests an impermissible motivation. Craig was fired on December 15, just four days after her statement that Main Street would be a better place to work if it were unionized. *See Kentucky General, Inc.*, 177 F.3d at 436 (noting that the employer's "decision to lay off both men only a few days after they engaged in picketing bolsters the inference that [the employer] terminated them because of their union activities"); *Aquatech, Inc.*, 926 F.2d at 545 (explaining that the proximity in time of protected concerted activity and discharge is suggestive of improper motivation). Although it is true that Craig had acted on behalf of other employees in regard to wage issues since nearly the start of her employment at Main Street, Craig's December 11 statement was the only pro-union statement she had made and could thus have been viewed by Main Street as more threatening. Moreover, Jeffers had expressed disapproval of Craig's protected concerted activity prior to her termination; April Craig testified that Jeffers told her to resolve her problems without the aid of Craig.

Because the Board properly concluded that the general counsel made a prima facie showing that Craig's conduct was a motivating factor in the decision to fire her, Main Street was then required to establish that her termination would have taken place in the absence of protected conduct. Main Street contended at the hearing that Craig was fired solely for her inability to work with Monson and the disruptions resulting from her hostility toward Monson. The Board found that Main Street had not made the requisite showing that Craig

## I. BACKGROUND

Main Street Terrace Care Center[1] operates a nursing home for the elderly in Lancaster, Ohio. This proceeding arises from an unfair labor practice charge filed against Main Street by former employee Mary Catherine Craig.

In June of 1996, Margie Keister, who was then the manager of the dietary department at Main Street, hired Craig as a dietary aide. At that time, after informing Craig of her wage, Keister told Craig "not to tell anyone [how much money she would be making], because it caused hard feelings, and the management did not want it known." Joint Appendix (hereinafter "J.A.") at 131 (M. Craig Test.). Craig's daughter April was also hired as a dietary aide at Main Street in March of 1997. Mary Jeffers, who became the manager of the dietary department in January of 1997, hired April Craig and similarly told her "[t]hat we [employees] were not allowed to discuss our paychecks with anyone." J.A. at 192 (A. Craig Test.).

During 1997, Craig assisted several dietary department employees with wage-related problems. First, shortly after she began working at Main Street, April Craig noticed numerous problems with her paychecks, including Main Street's failure to pay her appropriately for overtime work. April Craig asked her mother to speak to Jeffers and to Tracy Wentz, the payroll clerk, about the problems she was having. Craig did so on several occasions, and the paychecks were sometimes corrected. April Craig accompanied her mother to several of these discussions. On one occasion, when April Craig went to see Jeffers alone, Jeffers told April Craig "that [April] needed to come to [Jeffers] by [her]self." J.A. at 193 (A. Craig Test.).

---

[1] Main Street is not unionized.

In the spring of 1997, dietary department employee Joyce Rigby also discussed wage-related problems with Craig. Rigby, who worked as both a cook and dietary aide, had previously been paid two different wages for the two positions but complained that her wage had been changed to a flat rate. Craig, informing Rigby that April Craig still got paid two different wages, offered to talk with Jeffers about Rigby's complaint and subsequently did so. Although Craig's efforts failed, Rigby's pay was eventually changed, and Rigby thanked Craig for her assistance.

Finally, in September of 1997, Jeffers informed Craig and dietary department employee Tracy Jackson that they would be receiving a fifty-cent raise. Jeffers "told Tracy and [Craig], together, not to say anything to the other girls in the kitchen because they were not getting a raise." J.A. at 138 (M. Craig Test.). By November, Craig had received only a twenty-five-cent raise while Jackson had received no raise at all, and the two women had discussions about Main Street's failure to implement the promised raise. On one occasion, when Jeffers asked Craig what was wrong with Jackson, Craig complained to Jeffers that "you promised us a raise and we didn't get it, and Tracy's mad about it." J.A. at 140 (M. Craig Test.). Jeffers responded that it was an oversight and that the raises would be forthcoming.

In October of 1997, Jeffers completed a performance evaluation of Craig. Jeffers gave Craig an "outstanding" rating in the areas of dependability, initiative, self-improvement, and personality, and high "above average" marks in quality of work, quantity of work, and cooperation. Jeffers gave Craig an overall "outstanding" rating and recommended her continued employment. Also in October, Craig was voted "Employee of the Month" by the other employees in the nursing home.

In November, Lisa Cochran, the administrator of Main Street, held a dietary department meeting in her office for the purpose of discussing why the dietary staff was not getting

Substantial evidence also supports the Board's finding that Craig's engagement in protected concerted activity was a motivating factor in her discharge. The most convincing evidence of unlawful motivation is Main Street's departure from its progressive disciplinary policies in Craig's case, and its disparate treatment of Craig. Until the time of her discharge, Craig had been an excellent employee, as is evidenced by her October 1997 evaluation, in which Jeffers gave her the best overall mark and recommended her continued employment.[8] She was discharged ostensibly for her inability to get along with co-worker Monson and for the disruptions that she caused as a result. Main Street's policy was to give employees a warning for most instances of misconduct. J.A. at 126 (Jeffers Test.) (stating that employees should first receive a written warning for improper behavior and speech); J.A. at 87-88 (Employee Handbook) (noting that an oral reminder should be given for "[f]ailure to work together as a team and develop good working relationships" and for "[r]ude or improper behavior or speech"). However, Craig did not receive any reprimands, written or verbal, for the behavior that allegedly resulted in her discharge. Instead, Craig was immediately terminated, despite the fact that the employee handbook reserves termination for the most serious misconduct, such as abuse of residents and felonious behavior. Moreover, two dietary department employees who had recently been discharged, Abby Caldwell (who was discharged because Main Street had received complaints of rudeness from the family members of residents) and Ruth Konkle, both received reprimands before their termination. The fact that Craig, who had been an "outstanding employee," was given no warning that her behavior was problematic prior to her termination — in contravention of Main Street's policy and practice — is strong support for the Board's inference of unlawful motivation. *See, e.g., Tel Data Corp. v. NLRB*, 90 F.3d 1195,

---

[8] During her employment at Main Street, Craig received only one reprimand, which was from Keister for burning the chili.

she made the comment loud enough for the director of nursing to hear, and her testimony was explicitly credited by the ALJ.[6]  Second, Craig testified that the director of nursing looked up when Craig made this comment, which suggests that the director heard the statement.  Finally, the ALJ drew a negative inference from the fact that "[t]he director of nursing did not testify at the hearing herein to deny that he heard what Mary Craig said in her conversation with McKenzie on Thursday December 11, 1997." *Main Street*, 1999 WL at *9.  Although Main Street takes issue with the reliance upon this negative inference, it was not improper. *See Gatliff Coal Co.*, 953 F.2d at 252 (noting that the Board's "negative inferences about the absence of testimony from witnesses who should have been able to provide supporting testimony for [the employer]" supported the Board's finding of unlawful motivation).[7]

---

[6] Citing *NLRB v. Pioneer Plastics Corp.*, 379 F.2d 301 (1st Cir.), *cert. denied*, 389 U.S. 929 (1967), Main Street argues that conversations held within hearing distance of supervisors "in and of themselves are not a sufficient basis to infer knowledge." *Id.* at 306.  However, as in *Pioneer Plastics*, in this case there is additional evidence supporting an inference of knowledge — namely, the unrefuted testimony that the director of nursing looked up immediately after Craig's statement, and the fact that Main Street did not put on testimony to the contrary.

[7] Even assuming that the director of nursing actually overheard the statement, Main Street contends that there is no evidence supporting the inference that the director told Craig's supervisors. However, we will not displace the Board's reasonable inferences on review, *see, e.g., Kentucky General, Inc. v. NLRB,* 177 F.3d 430, 435 (6th Cir. 1999), and the Board's inference that management knew of the statement was not unreasonable. *Cf. NLRB v. Health Care Logistics, Inc.*, 784 F.2d 232, 237 (6th Cir. 1986) (sustaining ALJ's finding of employer knowledge of union activities on the basis of evidence that "the employees' discussions about union representation occurred in the main room of the small manufacturing facility during the workday with no real effort made to conceal these conversations from management and supervisory personnel" and on the basis of the timing of the terminations).

---

along.  Cochran encouraged the employees to speak candidly, and Craig explained that she had not been getting along with a new dietary aide, Bob Monson.  Craig complained that Monson was rude to the aides, that he ignored their requests for assistance, that he did not do his job, and that he made snide remarks about her.  After Craig made this statement, Cochran asked Craig, "If you can't get along with anybody, why are you here?"  J.A. at 145 (M. Craig Test.).  Craig then said "end of meeting" and walked out of Cochran's office.  J.A. at 145 (M. Craig Test.).

On the evening of December 10, 1997, Craig went to Main Street to retrieve April Craig's cigarette case.  Craig overheard Monson telling Jeffers that April Craig had been spreading lies about him and that she had not been doing her job.  When Craig heard Jeffers express agreement with Monson, she confronted Jeffers and asked her how she could make such untrue statements.  Before leaving, Craig told Jeffers that she thought Jeffers was being unfair.  Jeffers disagreed, and said that she was going to fire "whoever was making trouble in the kitchen."  J.A. at 157 (M. Craig Test.).  Craig told Jeffers that she should not fire her without a good reason, and threatened to file a lawsuit if Jeffers did.

The next day, a nurse came into the kitchen and told Craig that she was upset about having been passed over for a job.  Craig told the nurse to file a grievance.  Also that day, nursing aide Donna McKenzie was complaining about the way that she was being treated by Main Street.  McKenzie said "[w]ell if we had a union," J.A. at 153 (M. Craig Test.); Craig responded by saying, "If we had a union they would not treat any of us this way."  J.A. at 153 (M. Craig Test.).  Craig testified that she made this statement loud enough for the director of nursing, who was standing nearby, to hear.  Moreover, Craig testified that the director of nursing looked up when Craig made this statement.

On Monday, December 15, Cochran fired Craig.  Although Craig asked why, Cochran refused to provide an answer,

explaining that she was following personnel policies that allowed her to discharge without cause. Cochran later testified that she fired Craig at the request of Jeffers, who told Cochran "[t]hat Mary Craig was — uh, having — was not getting along with her co-worker, and that there was — there were several disruptions within the workplace, such as crying — uh, loud voice, talking very loudly or shouting — uh, banging pots and pans around — uh, and that was disruptive to the workplace and to the home itself, being where the kitchen and the serving area are located." J.A. at 239 (Cochran Test.).

Acting on an unfair labor practice charge filed by Craig after her termination, the Board's General Counsel issued a complaint alleging that Main Street violated § 8(a)(1) of the NLRA by promulgating a rule prohibiting employees from discussing wages among themselves and by discharging Craig for engaging in protected concerted activity. After a hearing held on July 7, 1998, the administrative law judge ("ALJ") concluded that Main Street violated § 8(a)(1) as alleged. On January 29, 1999, the Board affirmed the ALJ's findings and conclusions and adopted the ALJ's recommended order as written. *See Main Street Terrace Care Center*, 327 N.L.R.B. No. 101, No. 9-CA-35620, 1999 WL 64717, *1 (N.L.R.B. Jan. 29, 1999).

With regard to the first allegation, the ALJ found that Main Street had promulgated a rule prohibiting employees from discussing their wages, as "[t]wo different dietary managers told employees about this rule." *Main Street*, 1999 WL at *7. The ALJ then explained that "the mere existence of the rule inhibiting protected conduct, even if not enforced, constitutes an unlawful interference in violation of Section 8(a)(1) of the Act." *Id.* The ALJ also found that Main Street terminated Craig for engaging in protected concerted activity in violation of § 8(a)(1). First, the ALJ found that Craig engaged in protected concerted activity with regard to April Craig, Rigby, Jackson, the nurse, and McKenzie, and that on December 15, 1997, Main Street was aware of this activity. *See id.* at *9.

involving a question of employer motivation, the trier of fact employs the test articulated by the Board in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982). "This test, approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, requires the general counsel of the NLRB to make a showing sufficient to support the inference that the protected conduct was a motivating factor in the employer's decision. At that point, the burden shifts to the employer to establish that the adverse action would have taken place in the absence of the protected conduct, in the nature of an affirmative defense." *Arrow Elec. Co.*, 155 F.3d at 766 (citation and footnote omitted).

Because employers rarely admit that an employee's discharge was due to her engagement in protected concerted activity, circumstantial evidence alone may be sufficient to support a finding of unlawful motivation. *See Gatliff*, 953 F.2d at 251. An employer's motivation is a factual question, and the Board's determination in this regard must therefore be upheld if supported by substantial evidence. *See NLRB v. A & T Mfg. Co.*, 738 F.2d 148, 149 (6th Cir. 1984). Furthermore, "credibility determinations must be accepted unless it is clear that there is no rational basis for them." *Talsol Corp.*, 155 F.3d at 793 (quotation omitted).

Main Street first argues that the Board improperly considered Craig's remark to McKenzie as evidence of unlawful motivation because, it contends, there is no evidence that it had knowledge of the remark.[5] However, the Board's finding that Main Street was aware of this statement is supported by substantial evidence. First, Craig testified that

---

to the home itself." J.A. at 239 (Cochran Test.).

[5] Main Street does not contest the Board's finding that "[w]ithout question, [Main Street] knew about the concerted nature of Mary Craig's activities with respect to April Craig, Rigby and Jackson." *Main Street*, 1999 WL at *9.

The Board found that the employee's discharge as a result of this heated dispute violated § 8(a)(1), but the Fifth Circuit denied enforcement of the order, concluding that the employee's comment did not constitute a protected concerted activity. The Fifth Circuit explained that the employee's action was not concerted because the employee was not acting on behalf of her fellow employees and because she had never discussed the possibility of unionization with other employees. Her remark, therefore, "was the product of a purely personal dispute." *Id.* at 84.

In *Scooba Manufacturing*, the employee's remark was not concerted because no collective worker action was contemplated; the employee had simply used the word "union" in a personal dispute with a supervisor. In contrast, Craig's remark was made during a conversation with a fellow employee regarding unionization. Additionally, unlike the employee in *Scooba Manufacturing*, Craig had engaged in other protected activity on behalf of fellow employees in the past. Contrary to Main Street's arguments, Craig's remark was not the product of a purely personal dispute. Accordingly, the Board's finding that this conversation was protected concerted activity is reasonable and is affirmed.

### 2. Main Street's Motivation

Main Street has consistently maintained that Craig was discharged not for her engagement in protected concerted activity, but rather for disruptive behavior stemming from her inability to get along with co-worker Bob Monson.[4] In cases

---

[4] Main Street asserts in its brief that Craig was also discharged for insubordination, referring to her behavior at the November 11 meeting and to the incident with Jeffers on the evening of December 10. However, there is no evidence in the record to support this contention. Cochran testified that Craig was fired solely on Jeffers's recommendation, and that Jeffers told her Craig "was not getting along with her co-worker, and that . . . there were several disruptions within the workplace, such as crying — uh, loud voice, talking very loudly or shouting — uh, banging pots and pans around — uh, and that was disruptive to the workplace and

---

The ALJ further found that Craig's termination was motivated by her protected concerted activity, and that Main Street had not demonstrated that it would have terminated Craig even in the absence of the protected conduct. *See id.* at *9-*10.

On April 19, 1999, the Board filed the instant petition for enforcement of the order, and Main Street subsequently cross-petitioned for review. We have jurisdiction over the Board's petition and Main Street's cross-petition pursuant to §§ 10(e) and (f) of the NLRA, 29 U.S.C. §§ 160(e) & (f).

### II. ANALYSIS

When reviewing Board decisions, the scope of our inquiry is limited. "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e); *see also NLRB v. Talsol Corp.*, 155 F.3d 785, 793 (6th Cir. 1998). "We also review the Board's application of the law to particular facts under the substantial evidence standard." *Talsol*, 155 F.3d at 793 (quotation omitted). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Additionally, "[w]here the evidence supports two conflicting views, we may not disturb the Board's findings and its order must be enforced." *Id.* (quotation omitted); *see also Kentucky General, Inc. v. NLRB*, 177 F.3d 430, 435 (6th Cir. 1999) ("[T]he Board's reasonable inferences may not be displaced on review even though [we may] justifiably have reached a different conclusion." (quotation omitted) (second alteration in original)). Furthermore, the Board's interpretation of the NLRA must be upheld if reasonably defensible. *See Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 447 (6th Cir. 1999) ("The Board's conclusions of law must be affirmed if they are based upon a reasonable defensible construction of the Act."); *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119 (6th Cir. 1997) (explaining that courts must defer to the Board's interpretation of the NLRA if the Board's

construction is a reasonable one), *cert. denied*, 522 U.S. 1108 (1998).

## A. Promulgation of a Rule Prohibiting Discussion of Wages

Section 7 of the NLRA gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of these rights. 29 U.S.C. § 158(a)(1). The Board determined that Main Street violated § 8(a)(1) by promulgating a rule prohibiting employees from discussing wages with one another.

We have not previously examined whether such a rule constitutes an unfair labor practice under § 8(a)(1). "The test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 275 (6th Cir. 1999) (quoting *NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 105-06 (6th Cir. 1987), *cert. denied*, 485 U.S. 935 (1988)) (internal quotation marks omitted). The Supreme Court has explained that "the right of employees to self-organize and bargain collectively established by § 7 of the NLRA, 29 U.S.C. § 157, necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491 (1978).

In the instant case, substantial evidence in the record as a whole supports the Board's determination. The unrefuted testimony at the hearing established that two different dietary managers told Mary and April Craig not to discuss wages with other employees. In fact, Jeffers testified that she told

furthering group goals." *Compuware Corp.*, 134 F.3d at 1288.

"Concerted employee activities are protected by § 7 where the activities can reasonably be seen as affecting the terms or conditions of employment." *Gatliff Coal Co. v. NLRB*, 953 F.2d 247, 251 (6th Cir. 1992). We have held that protests of wages, hours, and working conditions, as well as the presentation of job-related grievances are activities protected by § 7. *See Lloyd A. Fry Roofing Co.*, 651 F.2d at 445.

The Board concluded that Craig engaged in protected concerted activity with respect to April Craig, Rigby, Jackson, the nurse whom she told to file a grievance, and McKenzie. "The Board's determination that an employee engaged in protected concerted activity is entitled to great deference." *Compuware Corp.*, 134 F.3d at 1288. The Board's determination that Craig's efforts to remedy the wage-related problems of April Craig, Rigby, and Jackson constituted protected concerted activity is clearly correct. As Main Street acknowledges, although Craig often confronted management alone, she was at all times acting as a representative of at least one other employee. Furthermore, Craig's complaints concerned matters protected by § 7, as they related to wages.

Main Street's principal argument is that Craig's statement to McKenzie that "[i]f we had a union they would not treat any of us this way" was not concerted activity, but was rather the product of a personal dispute. For this proposition, Main Street relies on the Fifth Circuit's decision in *Scooba Manufacturing Co. v. NLRB*, 694 F.2d 82 (5th Cir. 1982) (per curiam), *cert. denied*, 466 U.S. 926 (1984). In *Scooba Manufacturing*, an employee had a vigorous argument with her supervisor that was sparked by the employer's decision to fire her son. The argument escalated and turned to the employee's own work performance and absenteeism. Before leaving her supervisor's office, the employee angrily proclaimed: "It would be nice if it [sic] was a union here. A whole lot of things going on wouldn't be going on." *Id.* at 83.

## B. Discharge of Mary Craig

Main Street next challenges the Board's finding that it violated § 8(a)(1) by discharging Craig for engaging in protected concerted activity. It is well established that discharging an employee for engaging in activity protected by § 7 constitutes a violation of § 8(a)(1). *See, e.g., Arrow Elec. Co. v. NLRB*, 155 F.3d 762, 767 (6th Cir. 1998) (enforcing Board's determination that employer violated § 8(a)(1) by discharging employees for activity protected by § 7). We must therefore determine whether the Board properly concluded: (1) that Craig engaged in protected concerted activity under § 7; and (2) that Craig was discharged for engaging in this activity.

## 1. Protected Concerted Activity

It is well settled that "an individual employee may be engaged in concerted activity when he acts alone." *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 831 (1984). "For an individual's complaints to constitute concerted action, this court requires that the complaints 'must not have been made solely on behalf of an individual employee, but [they] must be made on behalf of other employees or at least with the object of inducing or preparing for group action.'" *Talsol Corp.*, 155 F.3d at 796 (quoting *Manimark Corp. v. NLRB*, 7 F.3d 547, 550 (6th Cir. 1993)) (alteration in original); *see also NLRB v. Lloyd A. Fry Roofing Co.*, 651 F.2d 442, 445 (6th Cir. 1981) ("An individual employee's complaint is 'concerted' if it is related to group action for the mutual aid or protection of other employees."); *Compuware Corp. v. NLRB*, 134 F.3d 1285, 1288 (6th Cir.), *cert. denied*, 523 U.S. 1123 (1998) (quoting this language). Additionally, it is not necessary that an employee be appointed by his fellow employees in order to represent their interests. *See, e.g., Talsol Corp.*, 155 F.3d at 796. The relevant inquiry in determining whether an employee's action was concerted, therefore, "is whether the employee acted with the purpose of

employees that the owner of the facility did not want employees talking with each other about wages. J.A. at 123 (Jeffers Test.). A rule prohibiting employees from communicating with one another regarding wages, a key objective of organizational activity, undoubtedly tends to interfere with the employees' right to engage in protected concerted activity. *See, e.g., Wilson Trophy Co. v. NLRB*, 989 F.2d 1502, 1510 (8th Cir. 1993) ("As [the employer] concedes, an unqualified rule barring wage discussions among employees without limitations as to time or place is presumptively invalid under the Act."); *Jeannette Corp. v. NLRB*, 532 F.2d 916, 918 (3d Cir. 1976) (sustaining the Board's finding that the employer's rule broadly prohibiting wage discussions was an unfair labor practice under § 8(a)(1), reasoning that "wage discussions can be protected activity and that an employer's unqualified rule barring such discussions has the tendency to inhibit such activity"). The Board, therefore, properly concluded that Main Street's rule constitutes an unfair labor practice in violation of § 8(a)(1).[2]

Main Street does not contest the general proposition that a rule prohibiting employees from discussing wages, absent a substantial and legitimate business justification, violates § 8(a)(1). Main Street instead contends that Jeffers's instructions to employees did not establish an unlawful rule. Main Street proffers the following three arguments in support of its contention: (1) its rule was not written or acknowledged; (2) neither Jeffers nor any other manager had the authority to promulgate such a rule; and (3) the rule went unenforced. These arguments, however, must fail.

First, the fact that the rule was promulgated orally rather than written in an employee handbook, for example, makes no

---

[2]The Supreme Court has explained that "it is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8(a)(1) is violated." *Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263, 269 (1965). In the instant case, however, Main Street has proffered no business justification for its rule.

difference to the § 8(a)(1) analysis.[3]  As we have explained, any rule prohibiting employee wage discussions — whether written or oral — has a tendency to discourage such protected discussions.  In fact, verbal warnings from a supervisor, who has the authority to discipline and to discharge, may be perceived by an employee as particularly coercive.  Main Street's argument would permit employers routinely to evade the dictates of the NLRA by accomplishing through an oral rule what cannot be done through a written one, and we accordingly reject this argument.

Main Street next makes the related argument that its management had no knowledge of the rule.  At the hearing before the ALJ, Administrator Cochran testified that she sets the rules for Main Street and that she has never adopted such a rule.  Cochran further testified that Jeffers has no authority to adopt rules for the company.  However, Main Street stipulated that Jeffers was a supervisor within the meaning of § 2(11) of the NLRA, 29 U.S.C. § 152(11).  *See Wilson Trophy Co.*, 989 F.2d at 1511 (rejecting argument that warehouse supervisor's statement prohibiting an employee from opening paychecks in the warehouse was not made within the scope of his authority because the employer stipulated that the warehouse supervisor was a supervisor within the meaning of § 2(11)).  Jeffers therefore had the authority "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or

---

[3]Main Street's contention that "[t]he only cases in which the NLRB has analyzed such a rule is where the rule was a written or acknowledged policy of the company," Respondent's Br. at 11, is simply wrong.  In *Franklin Iron & Metal Corp.*, 315 N.L.R.B. 819 (1994), *enforced*, 83 F.3d 156 (6th Cir. 1996), for example, the Board found that the employer promulgated an oral rule prohibiting employee wage discussions in violation of § 8(a)(1) on the basis of the testimony of two employees that the plant managers had told them not to discuss wages, despite the fact that one plant manager denied having made such statements.  *See id.* at 820; *see also Wilson Trophy Co.*, 989 F.2d at 1510-11 (affirming Board's finding that the employer promulgated a rule in violation of § 8(a)(1) where the warehouse supervisor told employees not to discuss wages).

responsibly to direct them, or to adjust their grievances, or effectively to recommend such action." 29 U.S.C. § 152(11).  In fact, Jeffers testified at the hearing that as dietary manager, she "[did] the hiring, firing, scheduling, ordering, supervising."  J.A. at 106 (Jeffers Test.).

Main Street's final contention that no rule existed because it was not routinely enforced also lacks merit.  As we have explained, in analyzing a § 8(a)(1) claim, "the actual effect of a statement is not so important as is its tendency to coerce." *NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102, 107 (6th Cir. 1987), *cert. denied*, 485 U.S. 935 (1988).  "We will uphold a finding of a violation if the employees reasonably could have concluded that the employer was coercing them." *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284, 1294 (6th Cir. 1997).  In the instant case, Mary and April Craig reasonably so could have concluded.  *See NLRB v. Vanguard Tours, Inc.*, 981 F.2d 62, 66-67 (2d Cir. 1992) ("Vanguard's employee handbook contained a rule prohibiting employees from making statements concerning wages, hours, the condition of buses, etc. . . . Because of the likely chilling effect of such a rule, the Board may conclude that the rule was an unfair labor practice even absent evidence of enforcement."); *Waco, Inc.*, 273 N.L.R.B. 746, 748 (1984) (rejecting the ALJ's finding that no § 8(a)(1) violation occurred because employees did not feel inhibited by the rule; "In assessing the lawfulness of the [employer's] rule, we are not concerned with the subjective impact of the rule on particular employees.  Instead, we must determine whether the rule reasonably tended to coerce employees in the exercise of their Section 7 rights . . . ." (footnote omitted)).

Therefore, we affirm the Board's conclusion that Main Street's rule prohibiting employee wage discussions violates § 8(a)(1) despite the fact that the rule was unwritten and routinely unenforced.