**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**United Steelworkers of America, AFL–CIO/CLC, Intervenor,**

v.

**TRI–COUNTY MANUFACTURING AND ASSEMBLY, INC., Respondent.**

No. 02–1174.

United States Court of Appeals, Sixth Circuit.

July 15, 2003.

2

Before KENNEDY and COLE, Circuit Judges; and WILLIAMS, District Judge.*

COLE, Circuit Judge.

The National Labor Relations Board ("NLRB" or "the Board") petitions this Court for enforcement of the Board's decision finding Respondent Tri–County Manufacturing and Assembly, Inc., ("Tri–County" or "the Company") to have violated § 8(a)(1) of the National Labor Relations Act ("NLRA" or "the Act"). 29 U.S.C. § 158(a)(1). Specifically, Tri–County was found to have violated § 8(a)(1) by threatening employees that the Company would cease to exist if they unionized, "daring" employees to come forward and contradict the Company's denial of an unfair labor practice allegation, and stating to employees that it would not sign a collective bargaining agreement. Additionally, Tri–County was found to have violated § 8(a)(1) when it suspended and then discharged employee Robert Moore because of his protected union activities. On appeal, Tri–County argues only that it did not violate § 8(a)(1) by suspending and discharging Moore because Moore's conduct did not constitute protected activity.

For the reasons that follow, we **GRANT** the Board's petition for enforcement.

## I.

Tri–County employs between 400 and 500 employees in Williamsburg, Kentucky. In January of 2000, the United Steelworkers of America ("the Union") began an effort to organize the work force at Tri–County's Williamsburg facility.

William Barefoot, the president of Tri–County, first became aware of the Union's attempts to organize in early March. On March 20 and 21, Barefoot and Plant Manager Jim Walker held a series of meetings for company employees in which the Union and the organizing campaign were discussed. Testimony before the Administrative Law Judge ("ALJ") indicated that, at these meetings, Barefoot and Walker were "scaring people, talking about mafia and violence and so on . . . telling people . . . that they needed to read the fine print, that if they signed a Union card they're signing their rights away," and that "there would be no [Tri–County] if the Union came in." Witnesses also testified that they were told that the Company would depart from Williamsburg if the Union came in, that the Union lied to employees, that they can be fined for being late with

---

* The Honorable Glen M. Williams, United States District Judge for the Western District of Virginia, sitting by designation.

their Union dues, and that other nearby companies had to shut down when the workers unionized.

Robert "Sammy" Moore was employed by Tri–County as a material handler from 1995 to 1998, and again from August 1999 until his suspension in March 2000. Moore testified that he supported the Union organizing campaign, and that he promoted the Union by asking people their opinions about the Union. According to Moore, he had heard from his relatives that if the Union gets in, the employees who do not sign Union cards can be fired.

On March 29, while Moore was putting away parts at the machine of a fellow employee, Johnny Draper, Moore asked Draper his opinion about the Union. According to Moore, Draper responded by stating, "If they hand out cards, I'd hand them back an empty one." Moore's response to Draper is the crux of the dispute. Moore testified that he replied, "Well, I heard that you—if the Union was voted in and the cards was passed out and you didn't sign one, you was fired." At this point, Draper reiterated that he would not sign one, and Moore then left him alone. According to the Company, however, Moore did not preface his statement with the phrase, "Well, I heard that." Draper's supervisor, Mark Thomas, testified that Draper approached him and told him that he had been threatened by Moore, who had told him that if he did not sign a Union card and the Union came in to Tri–County, he would be fired.

Later that same day, after Draper reported the conversation to Thomas, Plant Manager Greg Finley and Thomas met with Moore. At this meeting, Moore admitted to having a version of the conversation in question with Draper, and was then told that the Company would not tolerate any threatening or harassing of other employees over the Union. According to

Thomas, Moore was asked whether he told "a fellow employee that if they did not sign a Union card and the Union came in to [Tri–County] that they would be fired?" Moore admitted that he did. Moore responded by apologizing and stating that he did not realize that what he had done had been threatening. Moore was told that he was suspended for three days, after which he was to call Finley to see whether he still had a job. When Moore called Finley at the end of his suspension, he was told that his job was terminated.

The Board, adopting the decision of the ALJ, found that Tri–County had violated § 8(a)(1) of the Act in making assorted statements to employees about the repercussions of unionizing. In addition, the Board adopted the ALJ's finding that Tri–County violated § 8(a)(1) "by discriminatorily suspending and discharging Robert Moore because of his union and protected activities."

## II.

### A. Uncontested Violations of § 8(a)(1)

█ The failure of an employer to take issue with the Board's findings and conclusions with regard to violations of the Act results in the abandonment of the right to object to those determinations. *NLRB v. Talsol Corp.*, 155 F.3d 785, 793 (6th Cir. 1998). In failing to object to these determinations, Tri–County has effectively admitted the truth of the Board's findings. *Id.* In cases such as this, courts may summarily enforce the Board's order with regard to the issues to which the employer has not objected. *Id.* We therefore enforce the uncontested violations of the NLRA.

### B. Suspension and Termination of Moore

The Board's findings of fact are conclusive if they are supported by substantial

evidence in the record considered as a whole. *NLRB v. Main St. Terrace Care Ctr.*, 218 F.3d 531, 537 (6th Cir.2000). Substantial evidence means such evidence that a reasonable mind might accept to support a conclusion, even if there is also substantial evidence supporting an alternative conclusion. *Id.* This Court should defer to the Board's reasonable inferences and credibility determinations, even if it would have concluded differently under de novo review. *Painting Co. v. NLRB*, 298 F.3d 492, 499 (6th Cir.2002).

Section 8 of the NLRA provides that it is unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157." 29 U.S.C. § 158(a)(1). Section 157 ("Section 7") of the Act states that employees have the right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157. In order for activity to be protected and concerted, the Act does not require employees to "combine with one another in any particular way." *NLRB v. City Disposal Sys.*, 465 U.S. 822, 835, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). Nor does the Act's protection disappear simply because a single employee, acting alone, participates in an integral aspect of a collective process. *Id.* The Board's decision that an employee engaged in protected activity is entitled to great deference. *Main St. Terrace Care Ctr.*, 218 F.3d at 540.

■ Tri–County argues that the record does not contain substantial evidence to support the finding that Moore was engaging in protected activity during his conversation with Draper. However, it is well established that the Act protects communication among coworkers regarding an organizing campaign, as the right of em-ployees "to self-organize and bargain collectively ... necessarily encompasses the right to effectively communicate with one another regarding self-organization at the jobsite." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). Despite the Company's claims, it is clear that effective communication regarding self-organization includes discussions among employees of the perceived advantages and disadvantages of joining a union. Moreover, Moore testified that he supported the Union by asking other people for their opinions about unionization. The activity of an employee is considered concerted if undertaken with the purpose of furthering group goals. *Main St. Terrace Care Ctr.*, 218 F.3d at 539. The record allows for an interpretation of Moore's acts consistent with this purpose.

The dispute about what Moore actually told Draper does not aid the Company's cause. The Board made the finding of fact that Moore stated, "Well, I heard that—if the Union was voted in and the cards was passed out and you didn't sign up, you was fired." In so doing, the Board discredited Tri–County's claim that Moore had stated that if Draper did not sign a card and the Union came in, he could be fired. The ALJ's decision, adopted by the Board, stated explicitly why the decision was made to credit Moore's version of his statement to Draper. The ALJ noted that Draper was not called to testify and that there was no testimony, other than Moore's, by any witness to the conversation. Because this Court defers to the Board's credibility determinations, Moore's version of what was stated must be accepted. *See Painting Co.*, 298 F.3d at 499.

■ In an attempt to argue that Moore's activity was not "concerted," Tri–County emphasizes that Moore was acting alone, had not identified himself as acting

for the Union, was not soliciting a Union card, and was not wearing a Union button or any other insignia. However, the terminated employee in *Main Street Terrace Care Center* was acting alone, and had similarly failed to identify herself as acting for a union. 218 F.3d at 536.

Additionally, the Company's position that Moore was not engaging in concerted activity because he was not clearly associated with the Union is unavailing. The Company takes the position that Moore's statement to Draper constituted a threat. However, if Moore was acting neutrally, not known to be a Union supporter, and not looking toward group action, then there is no reason to interpret his statement as threatening in any way.

■ Tri–County also contends that conduct that appears to be within the broad parameters of the Act can lose its protection if the conduct itself is offensive to the protections of the Act. The Board, however, held that the statement Moore actually made "was not threatening, and was certainly not so egregious or flagrant as to deprive Moore of the Act's protection." This conclusion, as well, is entitled to deference by this Court. *See NLRB v. Cement Transp., Inc.,* 490 F.2d 1024, 1027 (6th Cir.1974). The ALJ's opinion, adopted by the Board, went on to comment that, during organizational campaigns, some amount of "misunderstood, misheard, or just plain wrong information[ ] is likely to be discussed among employees. To find that a statement like Moore's removes a conversation about the Union from the Act's protection would unnecessarily inhibit employees' ability to freely discuss, debate and consider the question of union representation." Similarly, this Court has previously held that, in the context of a struggle to organize a union, even "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth, so long as the allegedly offensive actions are directly related to activities protected by the Act and are not so egregious as to be considered indefensible." *Cement Transport,* 490 F.2d at 1029–30 (internal quotations omitted).

In the union organizing context, Moore's statement was relatively innocuous. In *Cement Transport,* for instance, this Court held that an employee's threat to help "tear down" the company was not so flagrant a threat as to remove the Act's protections. 490 F.2d at 1030. Moore was simply reporting what he had been told by his relatives, did not state or imply that he would, or even could, have Draper fired, and did not coerce Draper into supporting the Union because he referred to the distribution of Union membership cards following, rather than preceding, the election. Moore's statement was therefore hardly threatening or indefensible, and cannot be said to constitute a deliberate or reckless untruth.

Lastly, Tri–County argues that the Board improperly applied *NLRB v. Burnup & Sims,* 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964), by placing the burden of proof on the Company on the issue of whether Moore's conduct was protected activity. In *Burnup,* the Supreme Court held that when an employer fires an employee for misconduct during the course of protected activity, and the employee is innocent of the misconduct allegations, the employer has violated the Act even if it had a good faith belief that the employee actually did engage in misconduct. 379 U.S. at 23. Tri–County's contention, however, does not accurately represent the analysis made by the ALJ and adopted by the Board. *Burnup* was not cited by the ALJ for placing the burden of proof on the Company with regard to whether Moore was engaged in protected activity, but rather, with regard to whether Moore en-

gaged in misconduct so egregious as to remove the Act's protection. *Burnup* is therefore applicable to the present case in that it counsels that an employer's good faith belief that misconduct occurred is no defense when an employee is actually innocent. Because the Board found that Moore did not engage in misconduct during the course of his protected activity, even if Tri–County had a good faith belief that he had, his termination would have nevertheless violated the Act.

Tri–County also contends that the Board erred by failing to apply the legal standard found in *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980), *enforced* 662 F.2d 899 (1st Cir.1981). The *Wright Line* test requires an employee to show that he was engaged in protected activity of which the employer was aware, and that the activity was a substantial or motivating reason for the employer's action. *See Naomi Knitting Plant, a Div. of Andrex Indus. Corp.*, 328 NLRB 1279, 1999 WL 33495335, *4 (1999).

*Wright Line*, however, is inapplicable to the present case. This case turns on whether Moore was engaged in protected activity, and whether Moore engaged in egregious misconduct during that activity, such that the protections of the Act were removed. *Wright Line* applies to "dual-motive" cases, in which an employee has engaged in protected activity, but the employer asserts that the discharge was caused by unrelated job performance. Indeed, in *Wright Line* itself, the employee claimed that he was terminated due to his protected activities, while the employer conceded the protected activity, but claimed that he was terminated for inaccurate record keeping. 662 F.2d at 900. Recognizing that *Wright Line* applies to dual-motive cases, this Court has stated that *Wright Line* requires the employee to make a showing sufficient to support the inference that the protected conduct was the motivating factor in the employer's decision, at which point the burden shifts to the employer to establish that the adverse action would have taken place in the absence of the protected conduct. *Main St. Terrace Care Ctr.*, 218 F.3d at 541. In the present case, the conduct that Tri–County claims justifies the termination is the very same conduct that the Board determined to be protected activity. Accordingly, *Wright Line* is not instructive.

### III.

For the foregoing reasons, we **GRANT** the NLRB's petition for enforcement.