**NATIONAL LABOR RELATIONS BOARD, Petitioner–Appellee,**

Lucinda DARRAH, Intervenor–
Appellee,

v.

TRIANGLE ELECTRIC COMPANY
and General Motors Corporation,
Respondents–Appellants.

No. 02–1140.

United States Court of Appeals,
Sixth Circuit.

Oct. 14, 2003.

Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Margaret Ann Gaines, Fred B. Jacob, National Labor Relations Board, Washington, DC, for Petitioner.

Ellis Boal, Charlevoix, MI, for Intervenor.

Mark C. Pieroni, Edward W. Risko, Detroit, MI, for Respondent.

Before NORRIS, BATCHELDER, and ROGERS, Circuit Judges.

## OPINION

ALAN E. NORRIS, Circuit Judge.

Petitioner National Labor Relations Board seeks enforcement of its August 27, 2001 order requiring respondents Triangle Electric Company ("Triangle") and General Motors Corporation ("GM") to provide compensation and reinstatement to employment to former Triangle employee Lucinda Darrah and requiring GM to revise its anti-solicitation policy based on the Board's finding of unfair labor practices under the National Labor Relations Act. Triangle and GM challenge portions of the order; they do not challenge the requirement that GM revise its anti-solicitation policy. This court has jurisdiction under 29 U.S.C. § 160(e). Because we find that the Board's decision was not supported by substantial evidence, we REVERSE the challenged portions of the Board's order.

*Facts*

On April 1, 1996, Lucinda Darrah was hired as an electrician by Triangle, a GM subcontractor. While employed at GM's Hamtramck, Michigan factory, Darrah distributed, sold and solicited subscriptions for the *Detroit Sunday Journal,* a newspaper written and published by workers on

strike against the *Detroit News* and the *Detroit Free Press*. Darrah's activities were performed on GM property during the plant's hours of operation. Darrah gave proceeds of the sales to the striking workers.

The *Detroit Sunday Journal* covered the same news stories and contained the same features as one would expect in a typical commercial newspaper. Its masthead included the assertion "A Publication By Striking Detroit Newspaper Workers."

On April 22, 1996, a Pinkerton security guard, an agent of GM, filed a "Security Incident Report," recording an event that day involving Darrah:

> At above date & location this writer received call stating, Ms. Darrah was soliciting the strikers newspapers to GM employees & other contractors entering plant. When this writer informed her she could not distribute papers she asked why? I informed her that contractors or any other outside company is not allowed to sell, distribute or solicit on G.M. property. She continued to asked [sic] why? but returned papers to her bag and proceeded toward her job site.

Despite having been warned not to sell the newspaper, Darrah again attempted to sell and distribute copies on May 20. A Pinkerton guard prepared a security report that day which recorded a second confrontation:

> Details of incident: At above date and location, Ms. Darrah was in west entr[ance] corridor soliciting strike papers. This contractor emp[loyee] has been repeatedly instructed not to sell or distribute or solicit names for home delivery.... When this writer spoke with Ms. Darrah, she refuse[d] to give her name and just pack[ed] up [the] papers and return[ed] them to her car.

Later the same day, Darrah's supervisor informed her that GM personnel were disturbed by her sales of the newspaper in the plant. The next day Darrah was informed that GM had ordered Triangle to remove her from the plant. She received her termination paycheck and departed.

Darrah challenged her termination with the National Labor Relations Board. On May 11, 1999, an administrative law judge ("ALJ") ruled that Darrah was not entitled to compensatory relief or to reinstatement because GM had not received notice that Darrah was engaged in a concerted activity with other workers, as required under Section 8(a)(1) of the Act. Decision and Order, May 11, 1999 at 12. Darrah sought review with the Board.

On August 27, 2001, the Board reversed the ALJ's ruling regarding Darrah's entitlement to relief. It reasoned that the description of the newspapers as "strike papers" in the Pinkerton guards' reports was sufficient to put GM on notice that Darrah was involved in a concerted activity. Decision and Order, Aug. 27, 2001 at 3. One member of the Board dissented, stating that the guards' reports did not inform GM that Darrah was acting in concert with other workers. Decision and Order, Aug. 27, 2001 at 6.

## Discussion

This court reviews determinations by the Board under three different standards. Findings of fact and applications of law to fact are reviewed for substantial evidence, interpretations of the Act are reviewed under the deferential standard articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and all matters of law outside the Act are reviewed de novo. *FiveCAP, Inc. v. N.L.R.B.,* 294 F.3d 768, 776 (6th Cir.2002). The question of whether GM had notice of

the fact that Darrah was acting in concert with striking newspaper workers is a question of fact, and this court will affirm unless no substantial evidence exists in the record to support the Board's conclusion. Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

Section 8(a)(1) of the Act makes it unlawful "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in Section 7 of the Act. 29 U.S.C. § 158(a)(1). To conclude that GM violated Section 8(a)(1), the Board was required to find that GM knew about the activity, knew that it was concerted, and was motivated by the protected nature of the activity to terminate the employee in question. *Vemco, Inc. v. N.L.R.B.*, 79 F.3d 526, 530 (6th Cir.1996). GM challenges the Board's finding that it knew that Darrah's newspaper sales were performed as part of a concerted activity.

The Board determined that the Pinkerton guards' reports alone were sufficient to notify GM that Darrah was involved in a concerted activity with the striking newspaper workers. Its decision reads:

> [T]he record *does* clearly show that [GM] was aware of the concerted nature of Darrah's activity.... [T]he GM security reports themselves referred to Darrah's conduct as "distribut[ing]" and "soliciting" "strikers' newspapers" or "strike papers." Soliciting and distributing to other employees are quintessential group activities under the Act; as, of course, are strikes. Contrary to our

dissenting colleague, we think this description alone would therefore reasonably tend to put [GM] on notice that there was, or could be, a correlation between Darrah's activities and "mutual aid or protection" activities associated with the "strike," notwithstanding [GM]'s lack of knowledge concerning the precise contents of the strike newspaper or Darrah's motivation in distributing it.

Decision and Order, Aug. 27, 2001 at 3.

The Board's determination that the guards' reports notified GM that Darrah was engaged in a concerted activity is faulty. The reports in question merely identified the newspapers that Darrah was selling to be "strikers' newspapers" or "strike papers." They nowhere implied that Darrah's sale of those newspapers was performed in concert with the striking newspaper employees. The guards' reports do not show that GM knew anything other than the fact that Darrah was engaged on GM property in a commercial activity: the sale of ordinary newspapers. The Board conceded that GM did not know the precise contents of the newspaper. Nor did GM know of Darrah's motivation in distributing the newspaper—to obtain money to donate to the strikers' cause.

The Board stated that it relied upon the guards' reports alone in finding that GM had notice of Darrah's acting in concert with the striking newspaper workers. Because substantial evidence does not exist to support that conclusion, the Board's order is reversed.[1]

### Darrah's Request for Remand

At oral argument, Darrah's attorney requested that in the event of a ruling in favor of GM, we remand the case for a

---

**1.** Because we reverse the Board's order on the grounds that GM lacked notice, we need

not address GM's other arguments.

ruling on GM's anti-solicitation policy. The Board as well as the ALJ had found GM's policy to be overbroad and ordered GM to revise it. GM did not appeal this part of the Board's order, and there is no indication that GM has failed to revise its policy under that portion of the order. Because we find that GM did not act unlawfully in terminating Darrah's employment, Darrah is not entitled to monetary compensation for loss of income or to a reinstatement to employment. As a result, there is nothing to remand, and Darrah's request is denied.

### Conclusion

The challenged portions of the Board's order are hereby **REVERSED.**

ROGERS, Circuit Judge, dissenting.

I respectfully dissent, because in my view the Board properly found that Darrah's activities were protected and because substantial evidence supported the Board's determination that GM was on notice of Darrah's concerted activities.

*Chevron* deference applies to interpretations of the NLRA. *FiveCAP, Inc. v. NLRB,* 294 F.3d 768, 776 (6th Cir.2002); *NLRB v. Webcor Packaging, Inc.,* 118 F.3d 1115, 1119 (6th Cir.1997). The Supreme Court has "often reaffirmed that the task of defining the scope of § 7 'is for the Board to perform in the first instance as it considers the wide variety of cases that come before it,' and, on an issue that implicates its expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference." *NLRB v. City Disposal Sys. Inc.,* 465 U.S. 822, 829, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984) (quoting *Eastex, Inc. v. NLRB,* 437 U.S. 556, 568, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978)); *see also NLRB v. Local 1131, UAW,* 777 F.2d 1131, 1136 (6th Cir.1985) (noting that the " 'function of striking [the

balance between conflicting legitimate interests] to effectuate national labor policy is often a difficult and delicate responsibility, which Congress committed primarily to the [Board] subject to limited judicial review' " (alterations in original, quoting *Beth Israel Hosp. v. NLRB,* 437 U.S. 483, 500–01, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978))).

Board findings of fact are conclusive "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). The substantial evidence standard is met if the record as a whole contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Main St. Terrace Care Ctr.,* 218 F.3d 531, 537 (6th Cir.2000) (quoting *NLRB v. Talsol Corp.,* 155 F.3d 785, 793 (6th Cir.1998)). Additionally, "[w]here the evidence supports two conflicting views, [the Court] may not disturb the Board's findings and its order must be enforced." *Id.; see also Ky. Gen., Inc. v. NLRB,* 177 F.3d 430, 435 (6th Cir.1999) (stating that "the Board's reasonable inferences may not be displaced on review even though [we may] justifiably have reached a different conclusion" (alteration in original, quoting *Turnbull Cone Baking Co. v. NLRB,* 778 F.2d 292, 295 (6th Cir.1985))).

Section 7 of the NLRA, 29 U.S.C. § 157, provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" To hold GM liable for violating Section 7, the General Counsel must establish four things: (1) that Darrah's activity was concerted, (2) that GM knew it was concerted, (3) that her activity was protected, and (4) that her protected concerted activity was a motivating factor in GM's decision to terminate

her. *See Vemco, Inc. v. NLRB,* 79 F.3d 526, 530 (6th Cir.1996); *Meyers Indus., Inc.,* 268 N.L.R.B. 493, 497, 1984 WL 35992 (1984). GM primarily disputes elements (2) and (3), and appears to concede (1) and (4).

The majority concludes that there is insufficient evidence to support the Board's conclusion that GM was on notice that Darrah was engaged in concerted activity. Substantial evidence, however, supports the Board's finding that GM knew that Darrah's activity was concerted. In making this finding, the Board relied primarily on the reports of GM's security guards,[2] who were undisputedly GM's agents. As the Board noted in its opinion, "the GM security reports themselves referred to Darrah's conduct as 'distributing' and 'soliciting' 'strikers newspapers' or 'strike papers.' Soliciting and distributing to other employees are quintessential group activities under the Act; as, of course, are strikes." J.A. at 8. The Board concluded that

> this description alone would ... reasonably tend to put [GM] on notice that there was, or could be, a correlation between Darrah's activities and "mutual aid or protection" activities associated with the "strike," notwithstanding [GM's] lack of knowledge concerning the precise contents of the strike newspaper or Darrah's motivation in distributing it.
>
> ... Darrah engaged in solicitation/distribution activities directed at other employees, in nonwork areas during nonwork time and at her site of employment, of a specialized "strike" periodical. Although the strike newspaper

had a listed price on its cover and Darrah raised money for the strikers, this does not render Darrah akin to a "newsboy or newsgirl on the street"[.] Rather, Darrah's activities are essentially no different than the protected activities of any employee who, in a group effort, concertedly distributes or solicits leaflets, circulars, or other group material, and/or raises money for the group, at his or her place of employment during nonwork time and in nonwork areas.

JA 8–9.

Although an independent reading of the record might lead me to the conclusion that GM was not sufficiently on notice of Darrah's concerted activity, the guards' reports constitute substantial evidence to support the Board—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Main St. Terrace Care Ctr.,* 218 F.3d at 537; *see also Squier Distrib. Co. v. Local 7, Int'l Bhd. of Teamsters,* 801 F.2d 238, 241 (6th Cir.1986) ("Where there is substantial evidence in the record to support the Board's factual determinations, we 'may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." ' " (quoting *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962))). Also in support of the Board's finding is the fact that the strike was a high-profile event that GM officials surely knew of, and GM's Poletown plant was located in the heart of strike territory. Hence one could reason-

---

**2.** Namely, after the first incident on April 22, the guard who had accosted Darrah wrote an incident report for GM stating that "[a]t above date & location, this writer received call stating Ms. Darrah was soliciting the strikers newspapers to GM employees & other contractors entering plant." J.A. at 351.

Similarly, after the May 20 incident the guard's report stated that "Ms. Darrah was in west entrance corridor soliciting strike papers," and added that "[t]his contractor employee has been repeatedly instructed not to sell, or distribute or solicit names for home delivery." J.A. at 353.

ably conclude that GM would have known that someone who was selling the strikers' paper was acting in sympathy with the strikers and to support them. Further, the selling and giving away of newspapers—unlike the selling of commercial products such as Avon—is not a worker's normal way of making extra money, and hence GM would have reason to expect that Darrah was up to something more than commercial activity. Substantial evidence thus supports the Board's determination that GM was on notice of the concerted nature of Darrah's activity.

The majority does not reach GM's other argument, that Darrah's distribution of the Journal was not protected activity. That argument, however, also does not require us to overturn the Board's decision. The Board's determination in that regard has a legal basis to which we must defer and is supported by substantial evidence.

Darrah's distribution of the Journal was protected activity. Whether an activity is for "mutual aid and protection" and hence is protected is based on how immediately related the activity is to "employees' interests as employees." *Eastex*, 437 U.S. at 567. To be related to "employees' interests as employees" (and hence to be for "mutual aid and protection"), an activity must involve "employees' relations with their employer" to the degree that it could be fairly said that the activity "constitute[s] a manifestation of a 'labor dispute.'" *NLRB v. Leslie Metal Arts Co., Inc.*, 509 F.2d 811, 813 (6th Cir.1975). Conversely, "[w]hen employee activity is

directed at circumstances other than conditions of employment, it is outside the protection of Section 7." *Id.*

In the present case, the "activity" was, in a sense, twofold: Darrah's actions and purpose in selling the *Journal* and the content of the *Journal* itself. I will consider each aspect in turn.

Regarding Darrah's intent in selling the *Journal,* the Board found that

> [t]he purpose of Darrah's distribution activities was to support the strike of the Detroit newspaper employees. As noted, Darrah testified without contradiction that any money she received from her distributions went to support the strike, that she informed prospective recipients of the Sunday Journal that "I give the money to the strike," and that "I'd let people know that their money was going to go help the strike."

J.A. at 7. The Board additionally made a legal determination that an employee's strike-supporting purpose in distributing strike-related literature can make his or her activity "protected," even if the literature itself is not explicit strike "propaganda."[3] This determination is the legal foundation of the Board's holding, which holding was that Darrah's intent to support the strike, coupled with the *Journal'*s union-related content, amounted to protected activity. Further, since this is essentially a legal conclusion, it is entitled to deference.

GM argues that the Board erred by considering Darrah's purpose at all and

**3.** This is evident from the following passage of the Board's opinion:

> we find that the manner in which striking employees may exercise protected forms of "mutual aid or protection" is not limited merely to overt "propaganda" messages. It may, additionally, encompass other forms of activity, as here, when the purpose of the activity is to advance the strike itself. Put

> another way, concerted activity engaged in for the purpose of mutual aid or protection, as here, is not rendered unprotected simply because some feature of those activities suggests that, in other circumstances, the activities could have been pursued for purposes that would not be protected.

J.A. at 7–8.

predicts that if the Board's rule were to become the law, then outrightly commercial activities like selling Avon or flowers could be protected solely on the basis of the employee's subjective intent. First, it is not clear that purpose is legally irrelevant to the inquiry. *See, e.g., Wilkes–Barre Publ'g Co. v. Martin,* 266 N.L.R.B. 438, 1983 WL 24976 (1983) (in which an employee's financial support of a union newspaper was belied by a clearly commercial subjective intent, and this led to a finding of unprotected activity); *Kellogg Co. v. NLRB,* 457 F.2d 519, 523 (6th Cir. 1972) (noting that even an employee who is fired for refusing to cross a picket line is not engaging in protected activity where his refusal is based not on principle, but on personal reasons such as fear). Second, the Board did not hold in this case that subjective intent alone will render an activity protected, even if the employee's actions were otherwise not union-related. The Board's finding was that intent-to-aid, when coupled with the distribution of a strike-related newspaper, equals protected activity. Both elements were necessary to the Board's holding. Third, while the Board did make a finding of Darrah's purpose, the finding was based upon objective evidence—what Darrah did with the money she got, and what she told people she solicited. This was reasonable, and the Board's reliance on objective evidences of intent guards against the arbitrariness of what otherwise might indeed amount to mind-reading. Fourth, in determining whether an activity was labor-related, for "mutual aid or protection," it makes sense to look to manifestations of an employee's intent. This is particularly true in cases where an employee is distributing literature that is arguably but not unquestionably labor-related. In cases where an employee distributes blatantly union-supporting literature, his support of the union is obvious from the literature itself, and the nature of the literature establishes that the purpose is "mutual aid and protection"; in cases where the literature is not so blatant, further evidence is needed to establish this purpose. Overall, the Board's finding that objectively-manifested intent can render protected the distribution of otherwise-unprotected strike-related literature is a reasonable construction of the Act, and its finding regarding Darrah's intent is supported by substantial evidence.

Moreover, substantial evidence supports the Board's finding that "the purpose of the Sunday Journal is related and linked to the strike itself," J.A. at 8, such that, when combined with Darrah's intent, its distribution constituted protected activity. This finding was based on a number of factors, including the following: the *Journal*'s masthead declared that it was "A Publication By Striking Detroit Newspaper Workers"; the *Journal* was produced by striking employees; its purpose was in part to boost the morale of striking employees and promote strike solidarity; it furthered the union's boycott of the struck newspapers by providing an alternative for Detroit newspaper customers; it provided a forum to disseminate the strikers' viewpoint about strike issues; and its articles of incorporation provided that it would exist only as long as the strike existed. *See* J.A. at 8. Though the Board did not find that the *Journal* was overwhelmingly or even predominantly a strike tool, it did not have to make such a finding. All it had to find was that the *Journal* was strike-related enough to render reasonable the Board's finding that the nature of the *Journal*, along with Darrah's intent, equaled protected activity. Overall, then, the Board properly found that Darrah's activity was protected.

For the foregoing reasons, I respectfully dissent.